[S.F. No. 23431. July 21, 1976.]

CALIFORNIA HOUSING FINANCE AGENCY, Petitioner, v.
S. MICHAEL ELLIOTT, as Chairperson, etc., Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, Victor Sonenberg and Jeffrey L. Gunther, Deputy Attorneys General, for Petitioner.

Richard C. Salladin, W. Reece Bader, Roger L. Davis, Frederick Brown and Orrick, Herrington, Rowley & Sutcliffe for Respondent.

**OPINION**

**RICHARDSON, J.**—The California Housing Finance Agency (the Agency) seeks a writ of mandate compelling respondent, its chairperson and acting president, to print revenue bonds pursuant to the Zenovich-Moscone-Chacon Housing and Home Finance Act (the Act) (§ 41000 et seq. of the Health & Saf. Code, to which all subsequent statutory citations refer unless otherwise noted) and resolutions promulgated thereunder by the Agency. Respondent, by way of a demurrer to the petition for mandate, asserts that the Act and the Agency's resolutions suffer from numerous constitutional infirmities, and refuses to issue the requested bonds without an appropriate order from us. We have concluded that the Act, construed to incorporate the provisions of article XXXIV, section 1, of the state Constitution (local elections for low-cost housing projects), is constitutional. Rather than compelling respondent to print the bonds at this time, however, we have left the Agency free to choose whether or not it wishes to proceed with the bond issuance in light of this opinion.

█ Preliminarily, we note that mandate is the proper remedy to compel a public officer to perform ministerial acts such as issuance of bonds. It is well established that the constitutional validity of the law

authorizing a bond issuance may be determined in a proceeding for such a writ. (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513]; *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 170-171 [28 Cal.Rptr. 724, 379 P.2d 28]; *Golden Gate Bridge etc. Dist.* v. *Felt* (1931) 214 Cal. 308, 315-319 [5 P.2d 585].) We exercise our original mandate jurisdiction under article VI, section 10, of the California Constitution and California Rules of Court, rule 56, to review matters of public importance requiring prompt resolution. (*California Educational Facilities Authority* v. *Priest, supra,* at p. 598; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 944-945 [92 Cal.Rptr. 309, 479 P.2d 669]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].) We have long recognized that the matter of public housing is one of great public concern and importance. (*The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449 [94 P.2d 794].) Moreover, the Legislature has determined that there exists a vital and immediate need for decent, low-cost housing in this state (§§ 41001-41003). Accordingly, we issued an alternative writ of mandate to consider the important questions raised by the parties.

We examine the Act, the resolutions adopted pursuant thereto, and the several constitutional challenges presented.

*The Act*

The primary purpose of the Act is to "meet the housing needs of persons and families of low or moderate income" (§ 41331). In furtherance of this purpose, the Agency is authorized to issue revenue bonds in the aggregate principal amount of $450 million (§ 41700). Proceeds of the bonds are to be made available to "housing sponsors" (described generally in § 41044 as various types of private developers and local public entities) in the form of development loans, construction loans, mortgage loans (for new construction and rehabilitation) and advances in anticipation of such loans, to construct, develop and acquire housing developments (§§ 41450-41452). In addition, bond proceeds under the Act may be used either to purchase loans from qualified mortgage lenders (§§ 41455-41457) or to lend funds to qualified mortgage lenders on the condition that they make such loans (§§ 41465-41469). The construction so financed may include commercial and other

nonhousing facilities as are determined by the Agency to be an integral part of the housing developments and necessary or convenient in connection with the provision of housing pursuant to the Act (§ 41043).

The Act further appropriates $10 million from the general funds of the state to be paid into a supplementary bond security account. This fund is to be used "to secure payment of the principal of, and interest and sinking fund payment on, . . . [the bonds issued under the Act]." (§ 41715.)

Under the Act the Agency is required to evaluate project proposals, monitor construction, and supervise the maintenance of the housing developments (§§ 41391, 41480-41482), and to regulate the eligibility of and terms of agreement between sponsors and tenants (§ 41480, subds. (c), (d), (e)). We will examine these and other powers of the Agency in our consideration of the specific constitutional issues raised herein.

*The Resolutions*

Resolutions were adopted by the Agency pursuant to the Act on February 17, 1976. A master resolution contains the general authorization for the bond issuance and the specific terms and conditions of the bonds. This resolution is supplemented by three additional resolutions, each of which authorizes the issuance of $15 million principal amount of agency bonds.

The first supplemental resolution authorizes the issuance of bonds, denominated Series A, to fund loans to private housing sponsors (both limited profit and nonprofit) who will construct, develop and acquire low-rent housing. A portion of these proceeds is to be set aside either to purchase loans from qualified mortgage lenders or to lend to qualified mortgage lenders for the making of loans, including those made for the purpose of refinancing existing mortgage obligations. The housing units financed under this resolution are to be leased to persons and families who, under Agency standards, are unable to pay the rentals at which unassisted private enterprise is providing suitable housing.

The second supplemental resolution authorizes the sale of Series B bonds, the proceeds of which, as with Series A bonds, are to be used to

make loans directly to private housing sponsors (both limited profit and nonprofit). These sponsors are to use the funds to construct, develop and acquire *mixed* income housing, however, rather than low rent housing. The resolution defines mixed income housing as that in which no more than 75 percent of the rental units are rented to persons and families deemed by the Agency to meet the eligibility requirements contained in the first resolution.

The third supplemental resolution authorizes the sale of Series C bonds, the proceeds of which are to be used to make loans directly to local *public* entities acting as approved housing sponsors. These entities are to use the funds to construct, develop, and acquire *mixed* income housing developments, as defined in the second supplemental resolution.

Respondent asserts that the foregoing resolutions and the Act under which they were adopted violate the following state constitutional provisions: (1) article XVI, section 6, proscribing the lending of public credit and gift of public funds; (2) article XVI, section 3, prohibiting any state appropriation to an institution not under the exclusive management and control of the state; (3) article XVI, section 1, limiting the amount of state indebtedness which may be incurred without voter approval; and (4) article XXXIV, section 1, requiring voter approval in any community in which a low-rent housing project is to be developed or acquired by a state public body. We consider in turn each of these constitutional challenges.

1. *The Extension of Public Credit and the Gift of Public Funds*

Respondent argues that the resolutions hereinabove described violate the constitutional prohibition against the lending of public credit and the gift of public funds. (Cal. Const., art. XVI, § 6.) In particular, he focuses on the provisions which authorize the Agency to make loans to private housing sponsors and mortgage lenders at below-market interest rates, to purchase loans from certain lenders, and to refinance already existing mortgages. He also objects to the creation of the supplementary bond security fund. Each of these features, he contends, involves the unconstitutional use of state funds for the benefit of private individuals.

The Agency asserts that the housing program falls within the well recognized "public purpose" exception to the constitutional prohibition against the gift of public funds. ■ Under the public purpose doctrine, public credit may be extended and public funds disbursed if a direct and substantial public purpose is served and nonstate entities are benefited only as an incident to the public purpose. (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; *Winkelman v. City of Tiburon* (1973) 32 Cal.App.3d 834, 845 [108 Cal.Rptr. 415].) ". . . [T]he benefit to the state from an expenditure for a public purpose is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 745-746 [97 Cal.Rptr. 385, 488 P.2d 953], citations omitted.) Respondent, while acknowledging the validity of this exception, contends that it is inapplicable because the programs in question primarily benefit certain private parties and only indirectly aid the public.

The determination of whether a particular program serves a public purpose is generally vested in the Legislature. (*Id.*, at p. 746.) In the matter before us, the Legislature has determined that decent housing is an "essential motivating force" in helping people to fulfill themselves in a free society; that unsanitary, unsafe and overcrowded housing increases disease and crime; and that a healthy housing market, where the consumer has a choice of housing opportunities, is necessary to a healthy state economy (§ 41001). The Legislature has further found that there is a serious shortage of decent housing which persons and families of low or moderate income can afford; that private enterprise and investment will not and cannot meet this shortage without public assistance (§ 41003); and that it is for the benefit of the state as a whole to reduce the housing shortage (§ 41004).

The foregoing legislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary. (*Mannheim v. Superior Court* (1970) 3 Cal.3d 678, 691 [91 Cal.Rptr. 585, 478 P.2d 17]; *The Housing Authority v. Dockweiler, supra,* 14 Cal.2d 437, 449-450; *Board of Supervisors v. Dolan* (1975) 45 Cal.App.3d 237, 243 [119 Cal.Rptr. 347].) ■ There is considerable case law supporting the Agency's contention that the

Legislature acted reasonably in concluding that decent housing for the affected persons serves a public purpose.

Sometime ago in *The Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437, for example, we held that *public* housing projects for *low-income* families serve a public purpose. (*Id.,* at pp. 457-458.) Likewise, in *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777 [266 P.2d 105], the right of a public agency to use the power of eminent domain for slum clearance was upheld where the property so acquired was to be resold to *private* persons after redevelopment. More recently in *Winkelman* v. *City of Tiburon, supra,* 32 Cal.App.3d 834, the court approved the sale of property by a municipality to a *private* nonprofit corporation for a *mixed-income* housing project in which no more than 30 percent of the units were to be rented to low-income families. In doing so, the court found not only that the sale was supported by adequate monetary consideration but also that a valid public purpose was served by encouraging the construction of moderate and low-income housing projects. It thus concluded that such a sale at a *below-market* price would not constitute a gift of public funds. Finally, in *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d 237, the court upheld as serving a public purpose the issuance of bonds to public entities for the purpose of making long-term, low-interest rate loans to *private* individuals for residential rehabilitation in depressed housing areas even though the dwellings might subsequently be made available to families *without regard* to income.

Respondent seeks to distinguish each of these cases: *Dolan* did not involve the construction of new homes; *Winkelman* rested on an alternative holding; in *Hayes* and *Dockweiler,* the housing projects were to be developed only by a public agency; and in *Dockweiler,* the projects were designed only for low-income families.

While no prior case approves a housing scheme containing the identical combination of elements involved in the program herein at issue, we discern and trace in these prior cases common threads of substantially equivalent public purposes and policies. The additional objectives expressed in the program before us represent the integration of further public goals with that of increased safe and decent housing.

For example, the requirement that projects financed under the second and third resolutions provide units for tenants who can afford rentals at the market rate reflects a legitimate public purpose in avoiding ethnic, economic, and racial isolation in certain areas (§§ 41006, 41391). The participation of private developers and lenders in the program is part of an appropriate effort to enlist private capital in the implementation of the state's housing policy. (See *Appel* v. *Beyer* (1974) 39 Cal.App.3d Supp. 7, 11 [114 Cal.Rptr. 336].)

Each of those elements of the housing program at issue herein not previously upheld appears carefully designed to assist in achieving valid public purposes. For example, both the extensive regulations affecting the method by which private parties involved in the program must utilize the resources made available to them, and the restrictions on the profits that they may accumulate (§ 41482), are tailored to further the legislative purpose of supplying reasonable incentives to parties who would not otherwise provide the needed housing (see § 41003). Similarly, commercial facilities are permitted in the projects only after the Agency determines that such activities are necessary or convenient to the operation of the development (§ 41043) and any financial benefit accruing to these tenants derived from below-market interest rate financing must be contributed by the tenants to the development (§ 41480, subd. (c)).

The Act's provisions for the purchase of loans from qualified mortgage lenders and the financing of existing mortgages are directly related to the legislative finding that the shortage of decent housing is a result, in part, of the spread of slum conditions and blight to formerly sound and healthy neighborhoods (§ 41003). These provisions also support the Legislature's policy of protecting the equities that residents have accumulated in their homes (§ 41007). We note that in the face of contentions that housing programs similar to the one now before us constituted an illegal extension of public credit and gift of public funds, several states have upheld legislative schemes providing for the purchase of loans from lenders and the refinancing of mortgages. (E.g., *Minnesota Housing Finance Agency* v. *Hatfield* (1973) 297 Minn. 155 [210 N.W.2d 298]; *Maine State Housing Auth.* v. *Depositors Trust Co.* (Me. 1971) 278 A.2d 699; *Martin* v. *North Carolina Housing Corporation* (1970) 277 N.C. 29 [175 S.E.2d 665]; *Vermont Home Mtg. Cr. Ag.* v. *Montpelier Nat. Bank*

(1970) 128 Vt. 272 [262 A.2d 445]; *Walker* v. *Alaska State Mortgage Association* (Alaska 1966) 416 P.2d 245.)

The creation of a supplementary reserve fund to meet any deficiencies in the incomes and revenues of the projects used to pay bondholders is also an appropriate means to further valid public purposes. The Agency explains that by providing this additional security, it is able to obtain money for the projects at lower interest rates, thereby reducing rents and enabling occupancy in the projects by lower income persons. Private lenders and developers, whose profit is limited under section 41482, cannot benefit from this supplementary reserve protection. Bondholders, according to the Agency, are not directly benefited for they receive lower interest rates because of the additional security. This justification appears rational and in line with the program's legitimate public purposes.

Given the broad public purposes supporting the program and the close relationship between the elements of the program and these purposes, we conclude that the Act, and the Agency's resolutions thereunder, do not violate the constitutional prohibition against the gift of public funds and extension of public credit.

2. *Appropriation for Entities Not Under Exclusive Control of the State*

■ Respondent's second challenge is that the $10 million appropriation from the state's general fund for the Act's supplementary bond security account violates the constitutional prohibition against state appropriations for the benefit of entities not under the exclusive control and management of the state as a state institution. (Cal. Const., art. XVI, § 3.) He argues that among those benefiting from the reserve account are housing sponsors, lenders, and bondholders who are not under the exclusive control of the state.

As with the constitutional prohibition against the gift of public funds article XVI, section 3, has been construed to be inapplicable to those cases in which private parties are benefited by state appropriations only as an incident to the promotion of a public purpose. (E.g., *Daggett* v. *Colgan* (1891) 92 Cal. 53 [28 P. 51]; *Shean* v. *Edmonds* (1948) 89 Cal.App.2d 315 [200 P.2d 879]; *Stephens* v. *Chambers* (1917) 34 Cal.App.

660 [168 P. 595].) As previously observed, the supplementary reserve fund, by providing additional security for the bonds, is intended ultimately to strengthen the housing program by enabling the Agency to obtain money for the projects at lower interest rates. The additional security afforded to sponsors, lenders, and bondholders by the security fund, in our view, may fairly be deemed as incidental to the broader public purpose of the program, described above. Thus, for the same reason that the creation of the fund does not constitute an unlawful gift of public monies, neither does it violate the constitutional prohibition against appropriations for entities not controlled exclusively by the state.

### 3. *Creation of a State Debt Without Proper Public Authorization*

Article XVI, section 1, of the California Constitution requires that any law which will create a debt of the Legislature and which, in combination with any previous debts, will exceed $300,000 must be passed by a two-thirds vote of each house of the Legislature and a majority of the people voting in a general or primary election. Respondent maintains that the Act authorizes the creation of such a debt in violation of this section. We disagree.

Strictly speaking, the debts which will be created by the Act are debts of the Agency, not of the state, for they are to be paid not from the general funds of the state but from the housing project revenues (or, if necessary, from the reserve security fund already appropriated by the Legislature). We have held that debts which are payable solely from a special fund rather than from the state's general funds do not violate article XVI, section 1. (See *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 733 [290 P.2d 859].) Respondent, while conceding this point, argues that the state will be required by *practical* considerations to commit its general resources to the payment of these bonds in the event of a default. On this basis he concludes that the bonds will become, for all practical purposes, a charge against the state's general funds.

Section 41707 of the Act appears to acknowledge that a default in payment on the bonds would have an effect on the state's credit. The section provides for a Housing Bond Credit Committee to determine for each bond issue the adequacy of the program's security in protecting the

state's credit and to disapprove entirely, or reduce the amount of, the proposed issuance if the issue would create an undue risk. Furthermore, section 41364 contemplates that discretionary appropriations may be made by the Legislature if the Agency's funds prove insufficient to meet its obligations.

It does not necessarily follow, however, that bonds issued under the Act will become a debt chargeable against the state's general funds. Neither the above sections nor any other provision of the Act creates any enforceable obligations against the state general funds. As we emphasized in *California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d 593, indebtedness under article XVI, section 1, refers only to "legally enforceable obligations against the state's general funds or taxing power." (*Id.,* at p. 607.) Since the Act creates no obligations of this type we conclude that it does not violate article XVI, section 1.

### 4. *Construction of Low Rent Housing Projects Without a Public Vote*

We now examine respondent's final and critical argument that any bonds issued pursuant to the Act and the Agency's resolutions are rendered invalid because no provision is made for local elections to approve the development of the projects, as required by article XXXIV, section 1, of the California Constitution, adopted as an initiative measure in 1950. Section 1 provides in part: "No low rent housing project shall hereafter be *developed, constructed, or acquired in any manner by any state public body* until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election." (Italics added.) The constitutionality of this section was upheld by the United States Supreme Court in *James* v. *Valtierra* (1971) 402 U.S. 137 [28 L.Ed.2d 678, 91 S.Ct. 1331].

The Agency makes two responses to the article XXXIV argument. The first centers on the ownership of the project as reflected in the first and second resolutions of the Agency; the second, which concerns the second and third resolutions, involves the qualifications of the housing occupants.

(a) ■ *Does a State Public Body Develop, Construct, or Acquire the Housing Projects Under the Act?* The Agency first contends that its involvement under the first and second resolutions does not constitute the development, construction, or acquisition of low-rent housing projects within the meaning of article XXXIV, section 1, because the projects are to be owned and developed by private sponsors rather than by the Agency itself. We reject the argument in light of the very extensive Agency participation in the housing projects authorized under the Act.

Under the Act, before a project is financed, the Agency must take measures to assure the economic feasibility of the project, the financial eligibility of the sponsors and tenants, the consistency of the proposed projects with the Agency's objectives, access of the projects to supporting community services, and a location which furthers the policy of dispersing housing developments throughout communities thus avoiding concentration of low-income persons. (§ 41391.) Once a project is approved, the Agency must prescribe a uniform system of accounts and records for all sponsors; establish capital reserve requirements; set rents and eligibility standards for sponsors and tenants; regulate the occupancy agreements between sponsors and tenants; assure the provision of bilingual services to tenants where necessary (§ 41480); limit the profits of sponsors (§ 41482); prescribe grievance procedures between sponsors and tenants (§ 41400); insure that relocation payments be made to certain individuals displaced because of developments undertaken under the Act (§ 41397); and establish maximum sale prices for the housing developments (§ 41398). Further, the Agency is authorized to inspect the lands, building, equipment, books and records of the housing sponsors; to supervise the projects' operation and maintenance and to order repairs; to exact fees from housing sponsors to cover costs of inspection and regulation; to regulate the retirement of capital investments or the redemption of stock or distribution of any equity interest by any housing sponsor; and to withhold construction payments pending adequate performance of the acts required under the Agency-sponsor agreements. (§ 41481.)

The Agency contends that its admittedly extensive involvement does not constitute "development" within the meaning of article XXXIV, section 1. In this regard, it attempts to distinguish between the

entrepreneurial functions to be performed by private sponsors under the first and second resolutions and the financing function to be performed by the Agency. (See *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 872-873 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224], dis. opn. by Mosk, J.).

We note initially that even if the entrepreneur-financier distinction was significant in applying article XXXIV, section 1, the extensive supervision contemplated by the Act is not merely an aspect of the Agency's financing function; clearly, it is also a means to insure that the overall public policies and purposes of the program will be achieved. (See, e.g., §§ 41391, 41502.) The Agency's duties and interests as financier, while extending perhaps to the construction of safe housing developments (see *Connor* v. *Great Western Sav. & Loan Assn., supra,* 69 Cal.2d 850, at pp. 864-866), may not reasonably be said to encompass its extensive additional supervisorial and regulatory responsibilities. They do not extend, for example, to insuring that tenants are sufficiently needy to qualify for the program, that undue concentration of racial or economic groups are avoided, or that certain eviction or grievance procedures are followed. (See §§ 41391, 41400, 41496-41497, 41502.)

The Agency contends that insofar as it will "regulate" the foregoing policy matters, it will act not as a developer of the projects but rather as a regulatory state agency, akin to other regulatory bodies which monitor public licensees, and therefore not subject to article XXXIV, section 1. We find the argument unpersuasive. Unlike the Public Utilities Commission, the Department of Alcoholic Beverage Control, and other state regulatory agencies, the Agency does not enjoy a power to control and regulate a trade or enterprise on an industry-wide basis. (See Pub. Util. Code, § 701; Cal. Const., art. XX, § 22; Bus. & Prof. Code, § 23077.) The Agency's primary purpose is to *provide* for the housing needs of persons and families of low or moderate income (§ 41331), not to regulate an industry which is explicitly made the subject of a statewide regulatory system.

It would be a distortion to characterize the Agency as either a "regulatory body" or as a "financier," rather than "developer," for purposes of determining the applicability of article XXXIV, section 1. As discussed below, the constitutional provision at issue was adopted to

assure that whenever a state agency closely participates, or assists, in the development of a low-cost housing project, the matter will be submitted for approval to the vote of the electors affected thereby. We may not lightly disregard or blink at such a clear constitutional mandate.

The role of the Agency in the program before us is very similar to that of the federal government in the housing program considered in *Appel* v. *Beyer, supra,* 39 Cal.App.3d Supp. 7. In *Appel,* it was held that the federal government's involvement constituted "state action" necessitating compliance with certain due process requirements before tenants could be evicted. While *Appel* did not present the question of whether a state agency is a developer under article XXXIV, section 1, the court's appraisal of the government role in *Appel* is equally applicable to that of the Agency in the present case: "The government is, essentially, the landlord. Without the government, there would be no such low-cost housing; with the government, the quality and cost of the housing is such as the government allows." (*Id.,* at p. 13.) Because the state, through the Agency, not only makes possible but fully regulates the low cost housing project involved here, albeit through private sponsors, we conclude that the Agency must be considered a developer for purposes of article XXXIV, section 1.

The parties agree that the purpose underlying adoption of article XXXIV, section 1, was to permit the people of a community to have a voice in decisions which affect the future development of their community and which could substantially increase their tax burden. (*James* v. *Valtierra, supra,* 402 U.S. 137, at p. 143 [28 L.Ed.2d 678, at pp. 683-684]; *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d 237, at p. 250; Ballot Pamp., arguments to voters, Gen. Election Nov. 7, 1950 pp. 12-13; 55 Ops.Cal.Atty.Gen. 13 (1972); 53 Ops.Cal.Atty.Gen. 120 (1970); 52 Ops.Cal.Atty.Gen. 247 (1969); *id.,* at p. 133; 51 Ops.Cal.Atty.Gen. 245 (1968); 47 Ops.Cal.Atty.Gen. 17 (1966).) The people of California have reaffirmed their intention in this regard by their rejection at the November 5, 1974, general election of a ballot proposal for repeal of article XXXIV, section 1. We cannot ignore such a recent expression of the public will.

While it is not clear whether or not the projects before us will have the benefit of a local tax exemption (see Rev. & Tax. Code, § 214), they will

certainly have an impact, the dimensions of which may not as yet have been measured, on the physical characteristics of a community. It is also reasonable to conclude that the projects will place some financial strain on the taxpayers whose communities must provide additional services and assistance to low-income tenants. The electors in the affected communities must not be deprived of the opportunity to approve or disapprove the projects solely because private parties act as conduits for the purposes of carrying out the state-sponsored and Agency-regulated housing program. We therefore conclude that the Agency must be deemed to develop, construct, or acquire projects within the meaning of article XXXIV, section 1.

(b) ■ *Are Mixed Income Housing Projects Exempt From Article XXXIV, Section 1?* The Agency next contends that the section in question is not applicable to the second and third resolutions because they provide for the development of mixed-income rather than low-income projects. Mixed-income projects are defined by the resolutions as those which will make no more than 75 percent of the units available to persons and families deemed by the Agency to be unable to pay the amounts at which unassisted, private enterprise is providing suitable, safe, decent and sanitary housing. Since article XXXIV, section 1, is designed to encourage low-income housing, so the argument runs, and since the resolutions in question cover some units designed for persons of other than low income, the article is inapplicable to projects contemplated by these resolutions.

Article XXXIV defines low-rent housing projects as follows: ". . . any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise."

We conclude that article XXXIV, section 1, is applicable to the housing program before us even though the projects will include some units which will be available only to those who are able to pay the market rate for housing. As previously observed, the projects may well substantially affect the physical character of local communities and increase the burden of providing services to the residents of the community. The Attorney General, in an opinion which concluded that the requirements of article XXXIV, section 1, must be met in developing

a farm labor housing center, has reasoned that where a housing project will be a low-income housing project *in effect,* if not by exact definition, article XXXIV, section 1, is applicable. (55 Ops.Cal.Atty.Gen. 13, *supra.*) We find this reasoning persuasive. The substance and primary purpose of the housing program herein is to provide housing for those who cannot otherwise afford quality housing. The addition of units for other tenants, though helpful in serving and accomplishing recognized public purposes (see, e.g., §§ 41332.5, 41335), does not substantially affect either the basic character of the low-rent housing program or its potential impact on the community.

The Agency argues that its mixed-income projects should not be subject to the requirements of article XXXIV, section 1, because the program has built-in features which will render the project significantly different from those intended as the targets of this section. For example, the program provides an incentive to develop housing of higher quality than that usually associated with low-income housing by requiring developers to attract tenants willing to pay full-market rentals. The Act also directs that the program consider the aesthetic features of housing and high quality of design (§ 41006).

The foregoing features of the Act may well be considered by a community in which a proposed housing project is to be located, and may be reflected in voter approval or disapproval. Given the clear terms and purposes of the section, however, we find no basis in law or principle on which we may exempt the Act, the resolutions, or the programs envisioned thereby from the application of article XXXIV, section 1.

In passing we note that one court by way of dictum has recently stated that a "leased housing" program would not be subject to the requirements of article XXXIV, section 1, if only 30 percent of the project units in the program were to be made available to low-income tenants. (*Winkelman* v. *City of Tiburon, supra,* 32 Cal.App.3d 834, at p. 838.) In doing so, the court apparently assumed that article XXXIV, section 1, would be inapplicable to projects which were not *primarily* low income projects. (*Id.,* at p. 844.) We reserve for a future determination the question—may a housing project which consists of a relatively small portion of low-income tenants be deemed a "low-rent housing project" within the meaning of article XXXIV, section 1? The answer to such an inquiry would have no persuasive or controlling force in the case before us in which up to 75 percent of the housing units may be leased to low-income tenants.

*5. Conclusion*

■ Although we conclude that housing projects constructed or developed under the Agency's resolutions are subject to the local election requirement of article XXXIV, section 1, we do not find that the Act itself is unconstitutional. ■ In considering the constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act. (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204]; *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 452 [343 P.2d 8]; *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1]; *Reed* v. *California Coastal Zone Conservation Com.* (1975) 55 Cal.App.3d 889, 894 [127 Cal.Rptr. 786]; 13 Cal.Jur.3d, Constitutional Law, §§ 66, p. 124, 71, p. 133.) Thus, wherever possible, we will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute. (See, e.g., *In re Klor* (1966) 64 Cal.2d 816, 821 [51 Cal.Rptr. 903, 415 P.2d 791]; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839 [313 P.2d 545]; *Busch* v. *Turner* (1945) 26 Cal.2d 817, 820-821 [161 P.2d 456, 171 A.L.R. 1063]; *Collins* v. *Riley* (1944) 24 Cal.2d 912, 915 [152 P.2d 169]; *People* v. *Globe Grain & Mill. Co.* (1930) 211 Cal. 121, 127 [294 P. 3].) ■ Accordingly, in this case we uphold the Act, construing it to incorporate the requirements of article XXXIV, section 1.

Such a construction does not involve any "wholesale rewriting" of legislation, a process we have refused to undertake in the past. (See, e.g., *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 282 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 340 [38 Cal.Rptr. 625, 392 P.2d 385].) As stated in article XXXIV, section 2, the provisions of article XXXIV are self-executing. Section 1 " '. . . supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced . . . .' " (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723], app. dism. 348 U.S. 859 [99 L.Ed. 677, 75 S.Ct. 87], citation omitted; see *Chesney* v. *Byram* (1940) 15 Cal.2d 460, 462 [101 P.2d 1106].) In such a case, the constitutional language controlling, and the article containing within itself the generation of all necessary legal force, no detailed procedures, exceptions or qualifications are required in order to give effect to its provisions. Thus, no redrafting of the Act is necessary in order to meet the demands of this constitutional provision.

Our construction of the Act to include the requirements of article XXXIV, section 1, is consistent with the primary purpose of the Act in meeting the housing needs of persons and families of low or moderate income (§ 41331) as well as the additional stated legislative objectives (see § 41332.5). The constitutionally mandated local election requirement, while it may impede, perhaps even prevent, the development of the housing projects under the Act in some communities, does not conflict with the apparent legislative intent in enacting the statute. Indeed, in the absence of indications to the contrary, we must presume that the Legislature was fully aware of the election requirements constitutionally mandated and that it passed the Act with them in mind. (*Beach* v. *Von Detten* (1903) 139 Cal. 462, 465 [73 P. 187]; *Estate of Henry* (1944) 64 Cal.App.2d 76, 83 [148 P.2d 396].)

Having concluded that the Act is constitutional, we decline nonetheless to issue a peremptory writ of mandate. We hold that local elections are required by article XXXIV, section 1, of the state Constitution before housing projects are developed, constructed or acquired under the Act and the Agency's resolutions. Unable to anticipate whether the Agency will wish to proceed with the printing for sale and delivery of the bonds in question, in light of this holding, we decline to compel respondent to print the bonds. Moreover, since we must assume that the parties, should they elect to proceed with the bond issuance, will comply with our decision herein, no purpose would be served by issuing the requested writ. (See *Legislature* v. *Reinecke* (1973) 10 Cal.3d 396, 407 [110 Cal.Rptr. 718, 516 P.2d 6].)

The alternative writ of mandate is discharged and the petition for a peremptory writ is denied.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Clark, J., concurred.

Petitioner's application for a rehearing was denied August 18, 1976, and the opinion was modified to read as printed above.