[S.F. No. 23784. Sept. 18, 1978.]

CALIFORNIA HOUSING FINANCE AGENCY,
Petitioner, v.
FRANK PATITUCCI, as President, etc.,
Respondent.

COUNSEL

Evelle J. Younger, Attorney General, and Victor D. Sonenberg, Deputy Attorney General, for Petitioner.

John E. McDermott, Robert T. Olmos, Patricia M. Tenoso, Jonathan Lehrer-Graiwer, Alan Rader, Richard Rothschild, Richard Paez, Sandra Pettit, William Smith, Kathy Villeponteaux, Don Bryant and Jennifer Soloway as Amici Curiae on behalf of Petitioner.

James A. Hennefer for Respondent.

OPINION

**RICHARDSON, J.**—The California Housing Finance Agency (Agency) seeks a writ of mandate compelling respondent, its chairperson and president, to print and issue revenue bonds in accordance with an Agency resolution adopted under the provisions of the Zenovich-Moscone-Chacon Housing and Home Finance Act (the Act) (Health & Saf. Code, § 50000 et seq. (former § 41000 et seq.); all statutory references are to that code unless otherwise indicated). Respondent refuses to issue the bonds on the ground that the resolution violates article XXXIV of the California Constitution (art. XXXIV), which requires local voter approval before any "low rent housing project" may be "developed, constructed or acquired in any manner by any state public body." We have issued an alternative writ to consider the important public questions presented. (Cal. Const., art. VI, § 10.) We conclude that article XXXIV is not applicable to the resolution at issue herein and that the bonds authorized may be printed and offered for sale pursuant to the Agency's direction, and without a local election.

We have had occasion recently to examine the application of article XXXIV to similar action taken by the Agency under the Act. In *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575 [131 Cal.Rptr. 361, 551 P.2d 1193], we reviewed certain Agency resolutions which authorized the issuance of revenue bonds, the proceeds of which were to fund loans to private contractors (Series B bonds) and public entities (Series C bonds) for the construction, development and acquisition of "mixed income housing developments." (See §§ 50952, 51350-51351.) These resolutions defined "mixed income" developments as those

in which no more than *75 percent* of the units would be made available to those persons deemed unable to pay the rental rates offered by unassisted private enterprise for safe, decent, and sanitary housing. The resolutions did not provide for voter approval.

We measured the *Elliott* resolutions against article XXXIV, section 1, which provides: "No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election." We concluded in *Elliott* that the projects authorized and described in the resolutions were "low rent housing projects" as defined in article XXXIV, section 1, and that voter approval at local elections was required before the projects could be constructed. (17 Cal.3d at pp. 592-593.)

In 1976 the Legislature responded to *Elliott* by adopting the Public Housing Election Implementation Law (§§ 37000-37002, and 50093) which purports to define several of the expressions used in article XXXIV. Subdivision (a) of section 37001, for example, provides that a "low rent housing project" shall not include any "development" (1) which is both privately owned and carries no ad valorem property tax exemption, and (2) in which not more than *49 percent* of the units are made available to persons of low income.

In the matter before us, the Agency seeks, by its resolution No. 77-27, to issue its "1977 Series AA" revenue bonds in the aggregate principal amount of $3.75 million. The resolution recites that the bond proceeds are to be used to finance construction loans on a project to be designated by the president of the Agency and which meets the criteria described in section 37001, subdivision (a). Resolution No. 77-27, in section 301 of its article III, specifically provides that "[s]uch financing shall be without regard to whether said development has obtained approval of the local electorate as provided for in Article XXXIV, Section 1 of the Constitution of the State of California." Is the resolution constitutionally permissible under article XXXIV? ▇▇▇ Stated another way, the issue presented is whether a project meeting the criteria of section 37001, subdivision (a), that is, a privately owned, nontax-exempt housing development, in which no more than 49 percent of the units will be available to low income persons, nonetheless remains a "low rent housing project" within the

meaning of article XXXIV thereby requiring voter approval. We conclude that it does not.

The Agency's principal contention is that in assessing the effect of resolution No. 77-27, in the light of *Elliott,* we should defer to the Legislature's interpretation of article XXXIV, as expressed in section 37001, subdivision (a). ■ We agree, and have said that " '[w]hen the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance.' " (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 693 [97 Cal.Rptr. 1, 488 P.2d 161] quoting *Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 [154 P.2d 674].)

This rule of deference to legislative interpretation arises from the fact, which we have frequently noted, that the California Constitution, unlike its federal counterpart, is a limitation or restriction on the powers of the Legislature, rather than a grant of power to it. (*Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 868 [31 Cal.Rptr. 463, 382 P.2d 583].) From this principle, two constitutional consequences ensue: Any constitutional limitations on legislative power are to be narrowly construed (e.g., *Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169]), and a strong presumption of constitutionality supports the Legislature's acts. (*Methodist Hosp. of Sacramento, supra,* 5 Cal.3d at p. 691; *Delaney* v. *Lowery, supra,* 25 Cal.2d at pp. 568-569.)

■ In the instant case, as noted, the charter limitation is presented in this context: Article XXXIV requires referendum approval in the affected community before a "low rent housing project" can be developed, constructed, or acquired. Section 1 of the article defines "low rent housing project" as "any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise."

In *Elliott, supra,* 17 Cal.3d 575, we carefully considered the definition of a "low rent housing project." (*Id.,* at pp. 591-593.) We concluded that it could embrace a state-assisted "mixed-income" development in which rental accommodations for persons of "moderate" income are combined in a single housing development with rental units for those who, without financial assistance, could not obtain adequate housing. The Act iden-

tifies the development of such "mixed" housing as a principal function of the Agency in meeting critical housing needs for both moderate and low income groups, and as a partial solution to well recognized social problems engendered by racial and economic isolation. (E.g., §§ 50003, subd. (b), 50006, 50950, 50952, subd. (b).)

We found significant the allocation, in *Elliott*, of three fourths of the proposed units to "low income" housing, with the remainder of the development reserved for persons of moderate income. We declared that "the purpose underlying adoption of article XXXIV, section 1, was to permit the people of a community to have a voice in decisions which affect the future development of their community and which could *substantially* increase their tax burden. [Citations.]" (*Id.,* at pp. 590-591, italics added.) Though it was not clear that the development there proposed would be exempt from local property taxes (as are traditional publicly owned projects), we observed that it would undoubtedly have an effect on the physical characteristics of the community; moreover, "[i]t is also reasonable to conclude that the projects will place some financial strain on the taxpayers whose communities must provide additional services and assistance to low-income tenants." (*Id.,* at p. 592.)

We therefore concluded that the proposed plan was a "low income housing project" *in effect,* and that "[t]he addition of units for other tenants, though helpful in serving and accomplishing recognized public purposes . . . , does not *substantially* affect either the basic character of the low-rent housing program or its potential impact on the community." (*Id.,* at p. 592, italics added.) We expressly left unresolved, however, the question whether a mixed income project which includes a "relatively small" percentage of low income units may be deemed a "low rent housing project" under article XXXIV. (*Id.,* at p. 593.)

Thus, our decision in *Elliott* established several principles. First, we recognized that article XXXIV is not unambiguous in all of its applications; ample room remains under the constitutional language for honest disagreement as to whether a particular mixed income development constitutes a "low rent housing project." Second, we adopted a realistic and functional approach in considering the application of article XXXIV, recognizing that the potential economic impact on the affected community is the primary test to be applied. Third, we stressed that our *Elliott* holding was limited to its particular facts, and did not preclude a different result in other cases in which other or lesser proportions of housing units were reserved for low income tenants.

By its adoption of Health and Safety Code sections 37000-37002, the Legislature has sought to implement an important and comprehensive program to meet California's housing needs by resolving questions left unanswered in *Elliott*. The certainty the Legislature seeks to impose in this area, assuming of course that its actions are valid, is beneficial to the efficient administration of this program in promoting the marketability of the revenue bonds upon which much of the program's success depends. We, of course, are very mindful that article XXXIV is a direct expression of the People who, alone, have the power to adopt or change the Constitution (Cal. Const., art. XVIII, §§ 1-4), and that the judiciary, rather than the Legislature, is principally charged with its construction. Nonetheless, we affirm the Legislature's interpretive efforts unless they are disclosed to be unreasonable or clearly inconsistent with the express language or clear import of the Constitution.

We find sections 37000-37002 both reasonable and consistent with article XXXIV. Section 1 of article XXXIV defines a "low rent housing project" as one "composed of" housing "for" low income persons, and developed with public assistance. While we recognized in *Elliott* that a development is not exempt from article XXXIV simply because it includes some moderate income units, this does not mean that all developments which include *any low income* housing must be considered "low rent housing project[s]." (See *Elliott, supra,* 17 Cal.3d at p. 593.)

Where, as here, a constitutional amendment is subject to varying interpretations, evidence of its purpose may be drawn from many sources, including the historical context of the amendment, and the ballot arguments favoring the measure. (*In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881]; *Miro v. Superior Court* (1970) 5 Cal.App.3d 87, 96 [84 Cal.Rptr. 874].) In section 37000, the Legislature has made extensive findings about the motivating objects of article XXXIV as adopted by initiative in 1950, declaring that the article was primarily intended to provide "a mechanism for expressing community concern regarding the development, acquisition, or construction of *federally subsidized conventional housing projects*" (italics added). The section further emphasizes that these differ fundamentally from the privately owned, state-assisted, mixed-income developments promoted by the Act in terms of "architecture, design, and locational standards as well as the level of amenities provided." Moreover, section 37000 recites, "[s]uch [conventional] developments were occupied entirely by persons of low income, and usually were not subject to ad valorem property taxes."

There is substantial evidence that the proponents of article XXXIV were moved by two primary concerns, the direct drain on a community's finances and the effect on its aesthetic environment, represented by the tax exempt publicly owned low income housing of that day. In this connection, the 1950 ballot argument for Proposition 10 (enacted as art. XXXIV) is revealing, stating in pertinent part: "Time after time in the past year, California communities have had public housing projects forced upon them without regard either to the wishes of the citizens or community needs. *This is a particularly critical matter in view of the fact that the long-term multimillion-dollar public housing contracts call for tax waivers and other forms of local assistance, which the Federal Government says will amount to half the cost of the federal subsidy on the project as long as it exists.* [¶] For government to coerce such additional *hidden expenses* on the voters at a time when taxation and the cost of living have reached an extreme high is a 'gift' of debatable value. It should be accepted or rejected by ballot." (Italics added.) Newspaper and campaign literature concerning Proposition 10 emphasized that the issues were the effect of public housing on a community's property tax rolls and aesthetic values.

In 1974 the Legislature placed referendum Proposition 15 on the ballot, seeking to repeal article XXXIV. The ballot argument advanced by the opponents of Proposition 15 (that is, those who wished to retain art. XXXIV) stated, inter alia: "It is important to remember that the constitutional provision which Proposition 15 seeks to repeal applies only to conventional public housing which is publicly owned and tax exempt. It does not apply to other low income housing programs for which the housing remains on the tax rolls and, therefore, contributes its fair share to the financial obligations of the community."

 In view of the foregoing, and considering our analysis in *Elliott,* we conclude that the Legislature could reasonably have determined that a *privately owned, nontax-exempt development* in which *less than half* the units are intended for persons of low income is not a "low rent housing project" within the meaning of article XXXIV. Unlike the 75-25 percent housing mixture which we examined in *Elliott,* a development meeting the characteristics of section 37001 is not low income "in effect." Rather, it is truly "mixed income" housing, since it represents an obvious good faith effort to integrate low income tenants into a larger community in which the *majority* of people (at least 51 percent) are higher on the economic scale. The statutory requirement that the project be in private

ownership in order to immunize it from public referendum provides some assurance that the competitive need to attract moderate income tenants will ameliorate, in part, any aesthetic difficulties previously encountered with traditional publicly owned low income housing. Finally, the requirement that the project be subject to local property taxes fully eliminates the direct loss of local tax revenues which was a motivating factor in the adoption of article XXXIV. In any event, we think the Legislature, with its extensive fact-finding powers, is better suited than are we to assess the financial and aesthetic consequences of its policies. When it has made such judgments, we will not disturb them unless they are inherently improbable or unreasonable.

We have long noted the critical importance of governmental efforts to meet the housing needs of low and moderate income citizens. (*Elliott, supra,* 17 Cal.3d at p. 580; *The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 449 [94 P.2d 794].) In a comprehensive and innovative program, the Legislature has sought to fulfill these worthy goals while promoting economic and social integration and by enhancing, rather than endangering, the financial and environmental health of our communities. Its efforts in these positive directions are laudable and should not be thwarted by unduly restrictive interpretations of constitutional language adopted to meet different conditions.

We therefore hold that sections 37000-37002 represent a valid interpretation of article XXXIV of the state Constitution, to which interpretation we defer. The bonds here at issue will, by their very terms, be used only to finance projects which meet the requirements of the constitutional "exemption" specifically noted by these statutes. Accordingly, no local election is required before implementation of the resolution, by issuance and sale of the bonds, and construction of the project.

Our resolution of this case renders it unnecessary for us to reach the numerous other arguments raised by the parties and amici.

Having concluded that the restraints of article XXXIV do not bar the issuance of the bonds here under review, we assume that respondent will now voluntarily comply with the Agency's direction that they be printed and offered for sale. We therefore decline to issue the requested peremptory writ of mandate. (See *Hardie* v. *Eu* (1976) 18 Cal.3d 371, 380 [134 Cal.Rptr. 201, 556 P.2d 301]; *Elliott, supra,* 17 Cal.3d at p. 595.)

The alternative writ heretofore issued is discharged, and the petition for a peremptory writ is denied.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.