[Civ. No. 48073. First Dist., Div. Three. Dec. 31, 1981.]

JOHN J. CONWAY, Plaintiff and Appellant, v.
CITY OF SAN MATEO et al., Defendants and Respondents;
FLORES GARDENS, Intervener and Respondent.

**COUNSEL**

John J. Conway, in pro. per., and Francis J. Stillman for Plaintiff and Appellant.

Maurice K. Hamilton and Douglas Dang, City Attorneys, and Lyle L. Lopus, Assistant City Attorney, for Defendants and Respondents.

Robert K. Booth, Jr., and Wilson, Morton, Assaf & McElligott for Intervener and Respondent.

---

OPINION

SCOTT, Acting P. J.—Appellant John Conway filed a petition for writ of mandate, seeking to compel officials of the City of San Mateo to call an election and submit a proposed housing project for approval by city voters. After a hearing, judgment was entered denying the petition and this appeal followed.

I

On August 21, 1978, the city council of respondent City of San Mateo approved the execution of a lease of the land and air rights over certain city-owned real property then in use as a public parking lot. The lessee, respondent intervener Flores Gardens,[1] a California partnership, plans to construct a 72-unit apartment building over the parking lot, which would still be available for public use. The term of the lease is 55 years, with an option to renew for an additional 25 years. The rent for the first five-year period is $1,000 per month; for each succeeding five-year period thereafter, the rent is to be either increased or decreased according to a formula based on the area Consumer Price Index.

The apartment building is intended to be occupied by senior citizens and handicapped persons who are eligible for housing assistance payments from the United States Department of Housing and Urban Development (HUD). The lease expressly recites that the proposed site and project have been approved by HUD as a "Section 8" project.[2]

---

[1]Pursuant to Code of Civil Procedure section 387, the trial court granted Flores Gardens leave to file a complaint in intervention to resist appellant's petition.

[2]HUD's "Section 8" program is a rental assistance program. Monthly "housing assistance payments" are made either by HUD or a public housing agency to the project owner to assist an eligible family in leasing a unit within the project. In addition to the housing assistance payment, the project owner receives tenant rent directly from the family occupying the unit. The eligible family's share of the total rent is a percentage of their income. The total rent received by the project owner is a "Fair Market Rent" set by HUD. Section 8 projects may be owned and developed by all types of private developers and sponsors, including profit-motivated and nonprofit, and public housing agency developers are also eligible to develop housing assisted under this program. (24 C.F.R. § 880.101 et seq.)

The city council approved the project, subject to 39 conditions, among them the following: "35. Proof that this development has received a Section 8 allocation as a rent supplement project shall be submitted to the City of San Mateo before a building permit is issued. 36. The developer shall guarantee to operate this senior citizens' housing development under the Section 8 rent supplement program as long as this federal program or any like successor program exists, but in no case for less than a 20 year period now in force."

## II

Article XXXIV, section 1 of the California Constitution provides in pertinent part, "No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election ...."

Relying on article XXXIV, appellant John Conway, a San Mateo resident, taxpayer, and registered voter, sought to compel city officials to submit approval of the proposed project to the city electorate.

Denying appellant's petition for mandamus, the trial court found inter alia that the city's involvement in this project was "limited to that of a lessor and a regulator of land use pursuant to ordinary provisions of its Municipal Code." The court concluded that the city's involvement was not so extensive as to support a conclusion that the city was developing, constructing, or acquiring a housing project within the meaning of article XXXIV. The court denied appellant's request for a special finding that the project is a "low cost[3] housing project" as contemplated under article XXXIV.

Appellant contends that: (1) the project is a low rent housing project within the meaning of article XXXIV and the court erred in failing to so find; and (2) the court erred when it found that the city was not developing the project within the meaning of the article.

---

[3]While article XXXIV refers to a low *rent* rather than low *cost* project, no one has been misled by appellant's misstatement.

Preliminarily, we note that mandamus is the proper remedy for compelling an officer to conduct an election according to law. (*Wenke v. Hitchcock* (1972) 6 Cal.3d 746, 751 [100 Cal.Rptr. 290, 493 P.2d 1154].) However, it has long been the rule that in a petition for writ of mandate, the burden is on the petitioner to prove the existence of duty on the part of the defendants, rather than upon the defendants to disprove the same. (*MacLeod* v. *Long* (1930) 110 Cal.App. 334, 339 [294 P. 54].) Furthermore, we presume the judgment denying the petition to be correct, and the burden is on appellant to show reversible error. (*California Federation of Teachers* v. *Oxnard Elementary Sch.* (1969) 272 Cal.App.2d 514, 541 [77 Cal.Rptr. 497].)

The purpose underlying adoption of article XXXIV was to permit the people of a community to have a voice in decisions which affect the future development of their community and which could substantially increase their tax burden. (*California Housing Finance Agency* v. *Elliot* (1976) 17 Cal.3d 575, 591 [131 Cal.Rptr. 361, 551 P.2d 1193].) In *Elliot* the court considered the definition of a "low rent housing project," and concluded that it could encompass a "mixed-income" development in which rental accommodations for persons of "moderate" income were combined with rental units for those who, without financial assistance, could not obtain adequate housing. (*Id.,* at p. 592.) The court also held that a private ownership of a project did not preclude a finding that a public body had developed, acquired, or constructed the project within the meaning of article XXXIV, if the public body's financial and regulatory involvement was sufficiently extensive. (*Id.,* at pp. 589-591.)

The projects at issue in *Elliot* were developments in which no more than 75 percent of the units would be made available to those who needed financial assistance. Left unsettled was whether *Elliot* precluded a different result in other cases in which other or lesser proportions of housing units were reserved for low income tenants. In response to *Elliot,* the Legislature in 1976 enacted the Public Housing Election Implementation Law (Health & Saf. Code, §§ 37000-37002, and 50093) in order to "clarify ambiguities" in the meaning of article XXXIV. (Stats. 1976, ch. 1339, § 3, p. 6076.) In section 37000, the Legislature explained the need for the clarification. In part, that section provides, "The Legislature finds and declares that new forms of housing assistance can provide housing for persons of low income in a manner consistent with and supportive of optimum community improvement. Such forms of housing assistance may allow for mixed income occupan-

cy in developments representative of and competitive with similar market rate developments provided by the private sector. Such mixed income developments are frequently comparable to market rate projects in terms of architecture, design, and locational standards as well as the level of amenities provided, and may be subject to ad valorem property taxes. [¶] Recognizing that new forms of housing assistance provide new approaches for housing persons of low income, it is the intent of the Legislature ... to clarify ambiguities relating to the scope of the applicability of Article XXXIV which now exist."

In section 37001, the Legislature provided that developments which meet *either* of the following criteria are not "low rent housing projects" as defined by article XXXIV:[4] "(a)(1) The development is privately owned housing, receiving no ad valorem property tax exemption not fully reimbursed to all taxing entities; and (2) not more than 49 percent of the dwellings, apartments, or other living accommodations of such development may be occupied by persons of low ·income; or [¶] (b) The development is privately owned housing, is not exempt from ad valorem taxation by reason of any public ownership, and is not financed with direct long-term public lending."

In *California Housing Finance Agency* v. *Patitucci* (1978) 22 Cal.3d 171 [148 Cal.Rptr. 875, 583 P.2d 729], the Supreme Court held that the Legislature's interpretation of article XXXIV in sections 37000-37002 was both reasonable and consistent with the article itself, and was therefore valid. The court noted that in 1974 the Legislature placed a referendum on the ballot, seeking to repeal article XXXIV. The ballot argument advanced by those who wished to retain the article, and who prevailed in the election, stated, inter alia, "'It is important to remember that the constitutional provision which Proposition 15 seeks to repeal applies only to conventional public housing which is publicly owned and tax exempt. It does not apply to other low income housing programs for which the housing remains on the tax rolls and, therefore, contributes its fair share to the financial obligations of the community.'" (*Id.*, at p. 178.)

---

[4]In 1979 the Legislature amended Health and Safety Code section 37001, changing the words "direct long-term public lending" to "direct long-term financing from a public body," and adding several additional criteria, any one of which exempts a development from status as a low rent housing project. In addition, the Legislature enacted section 37001.3, setting forth the maximum income of "persons of low income," and section 37001.5, explaining activities of a public body which do *not* amount to developing, constructing or acquiring within the meaning of article XXXIV. (Stats. 1979, ch. 692, §§ 3, 4, p. 2163, eff. Jan. 1, 1980.)

■ Respondents urge and we agree that Flores Gardens' proposed project is exempt from the election requirement of article XXXIV because it meets the criteria set forth in subdivision (b) of Health and Safety Code section 37001.

First, it is undisputed that the proposed project will be privately owned. Second, there is no evidence in the record that the project will be exempt from ad valorem taxation by reason of any public ownership. ■ It is well-established that when there is a lease to a private owner of government-owned tax exempt land, the possessory right under the lease is subject to taxation. (*City of Desert Hot Springs* v. *County of Riverside* (1979) 91 Cal.App.3d 441, 449 [154 Cal.Rptr. 297]; *United States of America* v. *County of Fresno* (1975) 50 Cal.App.3d 633, 638 [123 Cal.Rptr. 548]; see Rev. & Tax. Code, §§ 103, 107; Cal. Admin. Code, tit. 18, § 1.) The lease expressly provides that it may create a possessory interest subject to property taxation, and the lessee has agreed to pay all real property taxes which may be levied during the lease term or any extension. Moreover, in response to this court's question to the parties concerning the tax status of the project, both lessor City of San Mateo and lessee Flores Gardens agree that that project will not be exempt from ad valorem taxation, and appellant cites no authority to establish otherwise.

■ Finally, there was no testimony at the hearing on the petition as to how this project was to be financed. However, the lease itself recites: "WHEREAS, the United States Department of Housing and Urban Development (hereinafter referred to as HUD) *insures project mortgages* for construction of lower and moderate housing under Section 221(d)4, and provides Housing Assistance Payments to qualified tenants thereof under its 'Section 8' Project; and HUD has approved both the proposed site and the proposed project as qualified for 'Section 8' participation; and . . . ." (Italics added.) Apparently the most common method of financing made in connection with "Section 8" new construction housing is through a loan made from a private institution, secured by a mortgage insured by HUD pursuant to 12 United States Code section 1715*l*(d)(4), which is section 221 of the National Housing Act (12 U.S.C. § 1701 et seq.) (See *Carson* v. *Alvord* (N.D.Ga. 1980) 487 F.Supp. 1049, 1051.) The purpose of section 1715*l* is to assist private industry in providing housing for low and moderate income families and displaced families. (12 U.S.C. 1715*l*(a)). In response to our questions, respondents have confirmed that the project is privately financed, with

a HUD guarantee.[5] HUD's participation as a project mortgage insurer is not equivalent to *direct* public lending. (Cf. 12 U.S.C. § 1701q, authorizing loans to assist private nonprofit corporations, limited profit sponsors, consumer cooperatives, or public bodies or agencies to provide housing and related facilities for elderly or handicapped families.)

In light of subdivision (b) of Health and Safety Code section 37001, the trial court did not err in refusing to find that this proposed project was a low rent housing project within the meaning of article XXXIV, as there is simply no evidence in the record to support such a finding. On that basis alone, the petition was properly denied, and we need not consider appellants' remaining contentions.

Judgment is affirmed.

Barry-Deal, J., and Anello, J.,* concurred.

A petition for a rehearing was denied January 28, 1982, and appellant's petition for a hearing by the Supreme Court was denied March 31, 1982.

---

[5]We are aware that in its memo in opposition to the petition at the trial court, intervener Flores Gardens stated that it will "receive financing by way of loans from ... (HUD)." We assume this to be a misstatement, given the reference in the lease to section 221(d)(4), which does not authorize direct loans from HUD.

*Assigned by the Chairperson of the Judicial Council.