[No. B214530. Second Dist., Div. Eight. Apr. 20, 2010.]

CITY OF CERRITOS et al., Plaintiffs, Cross-defendants and Respondents, v. CERRITOS TAXPAYERS ASSOCIATION et al., Defendants, Cross-complainants and Appellants; CUESTA VILLAS HOUSING CORPORATION et al., Cross-defendants and Respondents.

**COUNSEL**

Timothy K. Quick for Defendant, Cross-complainant and Appellant Cerritos Taxpayers Association.

C. Robert Ferguson for Defendant, Cross-complainant and Appellant United Community Alliance.

Richard A. Rothschild, S. Lynn Martinez and Andrea Luquetta for Western Center on Law and Poverty as Amicus Curiae on behalf of Defendants, Cross-complainants and Appellants.

Rutan & Tucker, Dan Slater, Mark J. Austin and William H. Ihrke for Plaintiffs, Cross-defendants and Respondents City of Cerritos and Cerritos Redevelopment Agency and for Cross-defendants and Respondents Cuesta Villas Housing Corporation, Laura Lee, Jim Edwards, Bruce W. Barrows, Joseph Cho and John F. Crawley.

Atkinson, Andelson, Loya, Ruud & Romo, Constance J. Schwindt, Martin A. Hom and Jennifer D. Cantrell for Plaintiff, Cross-defendant and Respondent ABC Unified School District.

---

**OPINION**

**LICHTMAN, J.*—**

## SUMMARY

The principal questions in this case are two. The first is whether a city and a redevelopment agency may use funds earmarked for low- and moderate-income housing to purchase and renovate property which would then be leased to a school district, as part of an arrangement in which the district would in turn lease other property (currently housing its administrative offices) to the redevelopment agency (and ultimately to a nonprofit housing corporation) for the construction of a low- and moderate-income apartment complex for senior citizens. The second question is whether the project, in which 16 percent of the apartments are designated for low-income households, must be submitted to a vote of the electorate under article XXXIV of the California Constitution, which requires voter approval for a "low rent housing project" developed, constructed or acquired by any state public body.

In a validation action brought under Code of Civil Procedure section 860 and Government Code section 53511, the trial court entered a judgment determining that the arrangements were valid and lawful in all respects and were not required to be submitted to a vote of the electorate. We agree and affirm the judgment.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## LEGAL, FACTUAL, AND PROCEDURAL BACKGROUND

To provide context for our discussion of the facts and the points at issue, we briefly summarize the redevelopment principles at play here, and then describe the parties and the contemplated transactions in more detail.

### 1. *The Community Redevelopment Law.*

█ The Community Redevelopment Law (CRL) was intended to help local governments revitalize blighted communities. (Health & Saf. Code, § 33000 et seq.; *Lancaster Redevelopment Agency v. Dibley* (1993) 20 Cal.App.4th 1656, 1658 [25 Cal.Rptr.2d 593] (*Lancaster*).)[1] Local redevelopment agencies have no power to tax, and instead are funded by "tax increment revenue." (*Craig v. City of Poway* (1994) 28 Cal.App.4th 319, 325 [33 Cal.Rptr.2d 528] (*Craig*).) Tax revenues available for local agencies from land within a redevelopment area are frozen as of the date a redevelopment plan is adopted, and any tax revenues generated by an increase in property values after adoption of the plan—the tax increment—are paid to the local redevelopment agency for use in financing the redevelopment project. (§ 33670; *Lancaster*, at p. 1658, fn. 2.)

One of the goals of the CRL is to increase the supply of low- and moderate-income housing. (*Lancaster, supra,* 20 Cal.App.4th at p. 1658.) However, local redevelopment agencies have had broad discretion to spend redevelopment funds in a manner best suited to the community, and "have historically devoted their resources to the commercial sector, rather than low-income housing development." (*Craig, supra,* 28 Cal.App.4th at p. 330.) Consequently, the CRL was amended in 1976 and now requires that at least 20 percent of the tax increment revenue be used by the agency "for the purposes of increasing, improving, and preserving the community's supply of low- and moderate-income housing available at affordable housing cost . . . ." (§ 33334.2, subd. (a); see *Craig, supra,* 28 Cal.App.4th at p. 334.) This 20 percent of the tax increment revenue is required to be set aside in a low- and moderate-income (LMI) housing fund (LMI Housing Fund). (§ 33334.3.)

Since enactment of the 20 percent set-aside for LMI housing, "the Legislature has repeatedly enacted amendments narrowing the agencies' discretion to ensure that the agencies place sufficient funds in their LMI Housing Fund and spend that money in an appropriate manner." (*Craig, supra,* 28 Cal.App.4th at p. 330.) *Craig* observed that the statutory provision at issue there—section 33334.2, subdivision (e)(2), governing onsite or offsite improvements—had

---

[1] Statutory references are to the Health and Safety Code except where otherwise specified.

been twice amended since 1979 to reflect "the Legislature's continuing concern that redevelopment agencies were misusing [the provision on offsite improvements] as a broad loophole to fund community-wide infrastructure and commercial development without any connection to affordable housing." (*Craig, supra,* 28 Cal.App.4th at pp. 335–336.)

### 2. *The events in this case.*

The City of Cerritos (City) and the Cerritos Redevelopment Agency (sometimes collectively referred to as the Agency)[2] adopted redevelopment plans for two areas in the 1970's, making all the necessary findings that the project areas were blighted and the plans would redevelop the project areas in conformity with the CRL. Increases in property values in those areas has resulted "in tens of millions of dollars in tax-increment revenue being earned by the Agency each year" (italics & boldface omitted), 20 percent of it set aside for LMI housing. If the Agency fails timely to expend or encumber the LMI housing funds, the funds may be transferred to the county housing authority or another public agency exercising housing development powers. (§ 33334.12, subd. (a).)

To comply with their affordable housing obligations, the City and the Agency entered into an agreement denominated "Affordable Housing, Financing, and Disposition and Development Agreement" (the financing agreement), to which the ABC Unified School District (District) and Cuesta Villas Housing Corporation (Cuesta Villas), a nonprofit public benefit corporation formed by the City, are also parties. As of January 8, 2008, after notices and many months of public meetings and hearings, all parties had approved and signed the financing agreement.

The financing agreement will ultimately result in the construction of a 247-unit affordable senior citizen apartment development, together with a senior recreation center and a park (the senior housing project), located on Norwalk Boulevard in Cerritos, a property now owned and used by the District. The financing agreement involves both the Norwalk Boulevard property and another property to which the District offices would be relocated. Specifically:

1. The 15.7-acre Norwalk Boulevard property presently houses the District's administrative office, warehouse, and kitchen facilities. Under the financing agreement:

---

[2] The members of the City Council of Cerritos also constitute the board of directors of the Agency, as permitted by section 33200: "[T]he legislative body may . . . declare itself to be the agency; in which case, all the rights, powers, duties, privileges and immunities, vested by this part in an agency, except as otherwise provided in this article, shall be vested in the legislative body of the community." (§ 33200, subd. (a).)

—The District, as lessor, will enter into a long-term ground lease with the Agency as lessee.

—The Agency will subsequently transfer its interest in the leasehold to a nonprofit housing corporation formed by the City (Cuesta Villas) for 55 years, for the construction, management, and operation of the senior housing project. (Cuesta Villas will apply for tax-exempt status as a charitable organization, and approval of its tax-exempt status is a condition precedent to the further implementation of the financing agreement.)

—When the ground lease is assigned to Cuesta Villas, Cuesta Villas will be obligated for ground lease payments to the District. The Agency will act as guarantor of Cuesta Villas's ground lease payments, "and to that extent using [LMI Housing] Fund monies . . . to pay the ground lease rents via [Cuesta Villas]."

—The Agency will finance Cuesta Villas's clearance of the Norwalk Boulevard property and the subsequent construction of the senior housing project, providing a $46 million loan (the total estimated cost of the improvements) to Cuesta Villas, forgivable after 55 years. After construction of the project, Cuesta Villas will own and operate the project.

—Cuesta Villas will be required to deposit all net income from operation of the project into a trust fund to be used solely for the benefit of the project.

—The Agency will reimburse the District for the costs of relocating its administrative offices, not to exceed $1 million.

—The total cost to the Agency of the conveyance of its ground lease interest in the Norwalk Boulevard property to Cuesta Villas totals $80,974,000: $33,974,000 for the ground lease payment guarantee, $46 million for the improvements, and $1 million in relocation costs to be paid to the District.

2. The District's facilities (currently on the Norwalk Boulevard property) will be relocated to existing office and warehouse buildings located at two adjacent properties on Moore and 166th Streets (the Moore/166th Street properties), as follows:

—The City, using LMI housing funds, will purchase the Moore/166th Street properties, totaling 4.6 acres, from private

owners, and will lease the properties to the District, giving the District an option to purchase at a later date. (This purchase has occurred; the City and the seller executed an agreement for the purchase and sale of the properties effective Jan. 28, 2008.)

—The City will renovate the Moore/166th Street properties to accommodate the District's functions.

—Approximately $18.5 million from the Agency's LMI Housing Fund is allocated to the City's purchase and renovation of the Moore/166th Street properties ($14.5 million for the purchase and $4 million for improvements to accommodate District functions). The purchase will be financed by the Agency's LMI Housing Fund "because such purchase is necessary for the production of affordable housing on the Norwalk Boulevard property."

—The revenue that will ultimately be generated in the form of lease payments by the District (and/or the sale of the property to the District under its purchase option) will be transferred to Cuesta Villas and deposited in the trust fund for use in the operation of the senior housing project.

—Under the District's purchase option, it is entitled to purchase the Moore/166th Street properties at the same price the City paid ($14.5 million), reduced to reflect lease payments already made by the District.

Additional facts relevant to the project will be related as necessary in connection with our discussion of the various points raised on appeal.

After all the parties approved the above described arrangements, the City, the Agency, and the District (sometimes collectively referred to as the public agencies) brought an action under section 860 of the Code of Civil Procedure to determine the validity of the financing agreement.[3] The lawsuit sought a determination that the financing agreement was a valid, binding and lawful agreement, and specifically that the Agency was lawfully permitted to spend LMI housing funds as contemplated in the agreement and without submitting

---

[3] Under Code of Civil Procedure section 860, a public agency may "upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court . . . to determine the validity of such matter. The action shall be in the nature of a proceeding in rem." Government Code section 53511 authorizes a local agency to bring an action pursuant to Code of Civil Procedure section 860 et seq. "to determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness . . . ." (Gov. Code, § 53511, subd. (a).)

the project to a vote of the electorate under article XXXIV, section 1 of the California Constitution. Cerritos Taxpayers Association and United Community Alliance answered the validation complaint and filed a cross-complaint against the public agencies and Cuesta Villas for declaratory and injunctive relief, claiming the public agencies' actions were invalid on several bases and seeking to enjoin implementation of the financing agreement.

The trial court entered a judgment validating the financing agreement, and Cerritos Taxpayers Association and United Community Alliance (collectively, Taxpayers) filed a timely appeal. We granted an application by the Western Center on Law & Poverty for leave to file a brief as amicus curiae in support of Taxpayers.

## DISCUSSION

Taxpayers contend the financing agreement is invalid for multiple reasons:

1. The expenditure of $18.5 million in LMI housing funds for the purchase and renovation of the Moore/166th Street properties was unlawful because the funds are being used to purchase and remodel property for the benefit of the District, and not for LMI housing.

2. The project is a low-rent housing project requiring voter approval under article XXXIV of the California Constitution.

3. The District was obliged under Government Code section 54222 to offer the Norwalk Boulevard property (which was designated surplus property) for sale or lease to other public agencies, and failed to do so.

4. The Agency failed to comply with section 33433 (requiring a report containing an explanation of why the transaction would assist in the elimination of blight), because the Agency's report did not refer to evidence supporting its finding that the project would "enable the provision of affordable housing in the community as a means to fulfill the obligation to eliminate blight . . . ."

5. Because city council members sit on the initial board of directors of Cuesta Villas, as well as on the city council and on the Agency's board, the common law doctrine of "incompatibility of office" applies, making those arrangements improper.

Amicus curiae Western Center on Law & Poverty, like Taxpayers, argues that the LMI Housing Fund cannot be used to buy and remodel buildings for the District, but offers a reason not presented to the trial court: that the use is

improper because section 33334.2 requires that offsite improvements paid for with the LMI Housing Fund be a "reasonable and fundamental component of the housing units" (§ 33334.2, subd. (e)(2)(A)) to be directly benefited.

We treat the parties' contentions in turn.[4]

A. *The purchase and renovation of the Moore/166th Street properties was a proper use of the LMI Housing Fund.*

Taxpayers assert—as does amicus curiae—that LMI housing funds cannot be used for the purchase and renovation of the Moore/166th Street properties to which the District offices will be moved in order to accommodate the senior housing project. Taxpayers contend this is so based on two case precedents which have held, respectively, that use of LMI housing funds for a road project and for an overpass were not permitted uses because, in each case, there was no nexus between the road project or the overpass and affordable housing. (*Craig, supra*, 28 Cal.App.4th at p. 336; *Lancaster, supra*, 20 Cal.App.4th at p. 1663.) Amicus curiae contends the use is improper because, after *Craig* and *Lancaster*, the Legislature again amended the statutory provision on offsite improvements (§ 33334.2, subd. (e)), making it clear that LMI housing funds may be used to pay for offsite improvements only when those improvements are "a reasonable and fundamental component of the housing units" (italics omitted) (and the housing units are "directly benefited" by the offsite improvements).

■ We conclude that subdivision (e)(2) of section 33334.2 (section 33334.2(e)(2)) does not apply in this case, because the purchase and renovation of the Moore/166th Street properties do not constitute "offsite improvements" within the contemplation of that subdivision. ■ Further, under the reasoning in *Craig* and *Lancaster*—requiring (in the context of expenditures for offsite improvements) "a nexus between the expenditures and the goal of improving and increasing affordable housing" (*Craig, supra*, 28 Cal.App.4th at p. 336, fn. 16)—the expenditures for the Moore/166th Street properties are clearly appropriate.

■ We begin with the relevant text of the CRL provision governing LMI housing funds. As we have seen, subdivision (a) of section 33334.2 requires

---

[4] Taxpayers also argue that the burden of proof in the validation action shifted to the public agencies, because the "evidence necessary to establish facts essential to [Taxpayers'] claim was peculiarly within the knowledge and competence of" the public agencies. It is difficult to comprehend the purport of this argument, as the validation action was tried on the administrative record which, as the trial court pointed out, was available to both sides. In any event, Taxpayers do not identify any respect in which the placement of the burden of proof operated to their detriment, and the issues raised on appeal do not depend on disputed questions of fact.

the funds to be used "for the purposes of increasing, improving, and preserving" the supply of LMI housing. Subdivision (e) of section 33334.2 now provides that, "[i]n carrying out the purposes of this section," the agency "may exercise any or all of its powers for the construction, rehabilitation, or preservation of affordable housing . . . including the following":

—"Acquire real property or building sites subject to Section 33334.16."[5] (§ 33334.2, subd. (e)(1).)

—"Improve real property or building sites with onsite or offsite improvements, but only if . . . the improvements are part of the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements, and are a reasonable and fundamental component of the housing units . . . ." (§ 33334.2(e)(2)(A).)

—"Donate real property to private or public persons or entities." (§ 33334.2, subd. (e)(3).)

—"Construct buildings or structures." (§ 33334.2, subd. (e)(5).)

—"Acquire buildings or structures." (§ 33334.2, subd. (e)(6).)

—"Rehabilitate buildings or structures."[6] (§ 33334.2, subd. (e)(7).)

■ From this statutory language, it is clear that a redevelopment agency may, with LMI housing funds, construct, acquire and renovate buildings or structures, as well as make onsite or offsite improvements. (§ 33334.2, subd. (e)(2)(A), (5), (6) & (7).) Moreover, this list of powers is inclusive, not exclusive; the introductory language to section 33334.2, subdivision (e), tells us that the agency may exercise "any or all of its powers for the construction, rehabilitation, or preservation of affordable housing . . . ."

Among the agency's powers is that conferred by section 33445, which allows the agency—if the legislative body makes certain determinations—to

---

[5] Section 33334.16 provides in part that: "For each interest in real property acquired using moneys from the Low and Moderate Income Housing Fund, the agency shall, within five years from the date it first acquires the property interest for the development of housing affordable to persons and families of low and moderate income, initiate activities consistent with the development of the property for that purpose." (§ 33334.16.) "A 'building site' as used by the Legislature and the courts has generally meant a parcel of undeveloped land in which a structure may legally be built." (*Craig, supra,* 28 Cal.App.4th at p. 339.)

[6] Other powers specified include financing insurance premiums; providing subsidies to persons and families of low or moderate income; developing plans and paying various forms of indebtedness; maintaining the community's supply of mobilehomes; and preserving the availability of affordable housing where it is threatened with conversion to market rates. (§ 33334.2, subd. (e)(4) & (8)–(11).)

"pay all or a part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement that is publicly owned and is located inside or contiguous to the project area . . . ."[7] (§ 33445, subd. (a).) That is exactly what the City and Agency have done in this case with respect to the Moore/166th Street properties: they have paid for "the land . . . and the cost of . . . [an] improvement that is publicly owned . . . ." (*Ibid.*) Consequently, unless the use of LMI housing funds for this purpose is expressly prohibited by the CRL, in our view the Agency's action is proper if—as is the case here—it is directly and specifically connected to the provision of LMI housing. As will appear, we see no statutory prohibition, and find the use of the LMI housing funds fully consonant with the statutory objectives.

■ First, we see no express statutory prohibition on the Agency's expenditure of LMI housing funds to purchase and renovate property to house the District's offices. Amicus curiae contends the purchase and renovation of the Moore/166th Street properties does not qualify "as an offsite improvement for which money meant to develop and improve affordable housing may be justifiably spent." With the first point we agree: the plain language of section 33334.2(e)(2) shows that an offsite improvement paid for with LMI housing funds must be "part of the new construction or rehabilitation of affordable housing units" and "a reasonable and fundamental component of the housing units . . . ." (§ 33334.2(e)(2)(A).) The Moore/166th Street properties are not "offsite improvements" within the meaning of section 33334.2(e)(2); they are more properly "buildings or structures" that are being acquired and rehabilitated. (§ 33334.2, subd. (e)(6) & (7).) As amicus curiae itself recognizes, an offsite improvement "is understood to mean 'offsite infrastructure necessary for new construction,' such as roads and utility connections," and the Moore/166th Street properties "are therefore not an offsite improvement to the Norwalk property . . . ." (See *Craig, supra,* 28 Cal.App.4th at p. 339; *Lancaster, supra,* 20 Cal.App.4th at p. 1662; see also *Fontana Redevelopment Agency v. Torres* (2007) 153 Cal.App.4th 902, 914 [62 Cal.Rptr.3d 875] [amendments to § 33334.2(e)(2) changed the law "to limit the use of tax increment designated for affordable housing to pay for infrastructure improvements unless they are part of new construction or rehabilitation of affordable housing"].) But the fact that the Moore/166th Street properties do not qualify as "offsite improvements" does not mean that the purchase and renovation of the property is forbidden.

And so we turn to the real question: may LMI housing funds be used to acquire and renovate buildings that will not themselves be used for affordable

---

[7] We quote (both here and later in this discussion) the current language of section 33445, which was amended effective January 1, 2010. The statutory revisions effected no substantive change for purposes of the analysis in this case.

housing? Taxpayers say no, citing *Craig* and *Lancaster*, and stating, without analysis, that $18.5 million in LMI housing funds "are being used to purchase and remodel property for the benefit of the District," and "are not being used for low and moderate [income] residential housing."[8] But *Craig* and *Lancaster*, while directed to the propriety of the use of LMI housing funds for offsite improvements, provide the analytical framework for determining whether the use proposed here is proper: does the use promote the statutory objective of increasing the supply of LMI housing (see *Lancaster, supra,* 20 Cal.App.4th at p. 1658), and is there "a nexus between the expenditures and the goal of improving and increasing affordable housing"? (*Craig, supra,* 28 Cal.App.4th at p. 336, fn. 16.)

Clearly there *is* a nexus between the expenditures for the Moore/166th Street properties and an increase in the supply of affordable housing, and the nexus is, as it must be, direct and specific: the purchase of the Moore/166th Street properties, as the trial court observed, "facilitates the housing project as it opens up the Norwalk Street [*sic*] property for the low and moderate income housing complex." In addition, the monies the District pays to lease (or purchase, if it exercises its option) the Moore/166th Street properties from the City is deposited in a trust fund to be used for the operation of the housing project, so, as the trial court also observed, there "is no net payment out of these restricted funds." In short, the expenditures for the Moore/166th Street properties will result in an increase in the supply of LMI housing—a "fundamental goal[]" of the CRL in general and of section 33334.2 in particular. (*Lancaster, supra,* 20 Cal.App.4th at p. 1658.)

Neither *Craig* nor *Lancaster*—both of which found that no nexus was established between expenditures for offsite improvements and the goal of improving or increasing affordable housing—supports a contrary conclusion. *Craig* involved a claim that the redevelopment agency had improperly used LMI housing funds to pay for construction of road improvements (a sound wall, sidewalk and gutter and lighting improvements) along a multilane street, adjoining which approximately 60 of the 90 households were of low or moderate income. (*Craig, supra,* 28 Cal.App.4th at p. 333.)[9] In *Craig* the

---

[8] Taxpayers point out that in September 2007, the Mayor of the City of Cerritos wrote to Senator Alan Lowenthal, seeking support for an amendment to the CRL. The amendment sought would have allowed a redevelopment agency to pay up to 25 percent of its LMI Housing Fund to school districts in the community, thus providing school districts "with additional funding to build new facilities for the growing student population impacting the school district as a result of the additional housing units being constructed in the community." Taxpayers claim this shows that "the unlawful nature of the District's Project was [known] to the City . . . ." This is not so, of course; the City's desire for changes in the law has no bearing on the legality *vel non* of the project at hand.

[9] As noted in the text, *ante,* the *Craig* court discussed the amendments to section 33334.2(e)(2), which reflected concern about its misuse as a loophole to fund community-wide

question was whether the road project "improved"—as opposed to "increased"—the community's supply of affordable housing within the meaning of section 33334.2. (*Craig*, at p. 336.) The court observed the agency had to show the LMI Housing Fund expenditures for the road project "served to directly improve affordable housing" (*id.* at p. 339), but the agency "failed to establish the requisite nexus between the [road project] and the statutory goal of 'improving' affordable housing." (*Id.* at pp. 341–342.) This was because the agency presented no evidence establishing that the road project "improved" the housing adjacent to the road (e.g., no evidence that the sound attenuation wall "made the sound problem better or in any other way had a beneficial effect on the homes in the neighborhood"). (*Id.* at p. 340, italics omitted; see *id.* at p. 338 [a redevelopment agency "must establish a direct link between the use of the LMI Housing Fund and the beneficial change in the condition of the affordable housing supply" (italics omitted)].) There is no inconsistency between *Craig*'s conclusion and this case, where the expenditures for the Moore/166th Street properties, because they free the Norwalk Boulevard property for the housing project, are a "direct link" to the increase in the supply of affordable housing. (*Id.* at p. 338.)

■ *Lancaster* likewise provides no assistance to Taxpayers. *Lancaster* held that the redevelopment agency could not use LMI Housing Fund monies "to fund an 'improvement' which has little, if anything, to do with the construction of affordable housing for the persons intended to be benefitted" by the CRL. (*Lancaster, supra*, 20 Cal.App.4th at p. 1658.) In *Lancaster*, the city wanted to build two overpasses to provide access to an undeveloped desert area approved for future development as a business park. (*Id.* at p. 1659.) The court said the overpasses were clearly an offsite improvement within the meaning of section 33334.2(e)(2), but "[w]hat is missing is the nexus between the overpasses and affordable housing." (*Lancaster*, at pp. 1662–1663.) The agency's theory was that the overpasses would open up the desert area to development in general, and that "[i]t follows . . . that

---

infrastructure and commercial development with no connection to affordable housing. (*Craig, supra*, 28 Cal.App.4th at p. 336.) Before the amendments to which *Craig* referred, section 33334.2(e)(2) provided that the agency could " '[i]mprove land or building sites with onsite or offsite improvements.' " (*Craig, supra*, 28 Cal.App.4th at p. 335, italics omitted.) In 1988, section 33334.2(e)(2) was amended to provide that the agency could " '[i]mprove land or building sites with onsite or offsite improvements, . . . but only if the improvements directly and specifically improve or increase the community's supply of low- or moderate-income housing.' " (*Craig*, at p. 335, italics omitted.) In 1992, section 33334.2(e)(2) was modified so that an agency could " '[i]mprove real property or building sites with onsite or offsite improvements, but only if . . . the improvements are made as part of a program which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons that are directly benefited by the improvements . . . .' " (*Craig*, at pp. 335–336, italics omitted.) The court held that under either version, "the Agency needed to establish a nexus between the expenditures and the goal of improving and increasing affordable housing," and that it had failed to do so. (*Id.* at p. 336, fn. 16.)

housing will be built and . . . affordable housing opportunities will necessarily follow." (*Id.* at p. 1663.) The court observed that "[p]ure speculation . . . is not enough because it does not show that the program is one 'which results' in new affordable housing."[10] (20 Cal.App.4th at p. 1663.) Here, the opposite is so; the expenditures for the Moore/166th Street properties are directly linked to the provision of new affordable housing on the Norwalk Boulevard property. Indeed, as *Lancaster* observed, "Under the plain language of the statute, an Agency may legitimately undertake efforts to increase the supply of affordable housing by innovative projects which do not include the present construction of new units." (*Id.* at p. 1662.)

Amicus curiae make two other arguments. One involves section 33445—which authorizes the Agency to pay for land and improvements that are publicly owned—and one involves the District's relocation costs. Neither has merit.

■ First, section 33445. A redevelopment agency may, with legislative consent, pay "the value of the land for and the cost of the installation and construction of any building . . . or other improvement that is publicly owned," if the legislative body determines that (1) the acquisition or construction is of benefit to the project area by helping to eliminate blight or providing housing for low- or moderate-income persons, (2) no other reasonable means of financing the acquisition or construction of the improvements are available, and (3) the payment is consistent with the agency's implementation plan under section 33490.[11] (§ 33445, subd. (a).) Amicus curiae claims the Agency failed to show there were no funds available other than LMI housing funds to purchase and renovate the Moore/166th Street properties. (See § 33445, subd. (a)(2).) Amicus curiae is mistaken. The City and Agency made all the findings required by section 33445, subdivision (a), both when they approved the financing agreement and later when they approved the acquisition of the properties from the prior owner—including a finding that no funds were available other than those from the Agency's budget.[12] Nothing further is required by section 33445. And, as subdivision (b) of that

---

[10] At the time, former section 33334.2(e)(2) permitted the use of LMI housing funds for onsite or offsite improvements only if the improvements were made as part of a program " 'which results in the new construction or rehabilitation of affordable housing units for low- or moderate-income persons . . . .' " (*Lancaster, supra,* 20 Cal.App.4th at pp. 1661–1662, italics omitted, quoting Stats. 1992, ch. 1356, § 8, p. 6779, eff. Jan. 1, 1993.)

[11] Redevelopment agencies that adopted a redevelopment plan prior to 1994 must adopt an implementation plan every five years, containing specific goals and objectives for the project area, specific programs and estimated expenditures, as well as an explanation of how the goals and objectives, programs and expenditures will eliminate blight within the project area and implement the requirements of section 33334.2 and other provisions of the CRL. (§ 33490, subd. (a)(1)(A).)

[12] The City and Agency found, "[p]ursuant to Health and Safety Code Section 33445," that: "In the management of its fiscal affairs, the City has developed reserves, the interest on which

section states, "The determinations made by the agency and the local legislative body pursuant to subdivision (a) shall be final and conclusive." (§ 33445, subd. (b)(1).)

Second, amicus curiae argues that a school district is not an entity entitled to relocation assistance under either redevelopment or relocation law, and even if it were, relocation assistance cannot include the purchase and renovation of the Moore/166th Street properties. As the Agency points out, these arguments are wholly irrelevant, as the laws to which amicus curiae refer merely describe the circumstances under which an agency *must* provide relocation assistance to families, persons, and nonprofit local community institutions that are temporarily or permanently displaced by a project. (§ 33411.) The relocation provisions in the CRL (§§ 33410–33418) do not limit the circumstances in which an agency *may* reimburse relocation costs so long as the agency otherwise complies with the CRL.[13] (See § 33415 ["[t]his section [(requiring the agency to provide relocation assistance required by the Gov. Code (§ 7260 et seq.))] shall not be construed to limit any other authority which an agency may have to make other relocation assistance payments . . ."]; Gov. Code, § 7272.3 [same].)

In sum: The use of LMI housing funds to purchase and renovate the Moore/166th Street properties is a permissible use of those funds. Section 33334.2(e)(2) is applicable to offsite improvements—"infrastructure necessary for new construction" (*Craig, supra*, 28 Cal.App.4th at p. 339)—and does not apply here. The question is whether the agency may use LMI housing funds to acquire and renovate buildings that will not themselves be used for affordable housing, and the answer is that it may, if the acquisition is directly linked to a transaction that will increase the supply of affordable housing. As *Craig* tells us, "there is no question but that the primary purpose of section 33334.2 was to compel redevelopment agencies to increase the supply of affordable housing." (*Craig*, at p. 338.) That objective is fully accomplished in the circumstances of this case.

 B. *Article XXXIV of the California Constitution does not require submission of the project to a vote of the electorate.*

The senior housing project will contain 247 units. Twenty-five units are restricted to "very low income" households; 15 units are restricted to "low

---

the City uses to provide for the on-going needs of the City. Were it not for this interest income, the City would be unable to provide the services that the community requires. The City has reached the maximum potential use for this interest income, and therefore no other funds are available to provide affordable housing other than those from the Cerritos Redevelopment Agency budget."

[13] Taxpayers concede that "relocation of the District's offices from the Norwalk Blvd. Property is a permitted use of LMI to increase affordable housing . . . ."

income" households, and 207 units are restricted to "moderate income" households.[14] Thus only 16 percent of the units will be dedicated to very-low- or low-income households.[15]

■ Article XXXIV of the California Constitution is addressed to public housing project law. It was adopted by initiative in 1950, and provides that "[n]o low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body" until a majority of the electorate votes in favor of the project. (Cal. Const., art. XXXIV, § 1.) The term "low rent housing project" means "any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a state public body . . . ." (*Ibid.*) The term "persons of low income" is defined, for purposes of article XXXIV only, as "persons or families who lack the amount of income which is necessary (as determined by the state public body developing, constructing, or acquiring the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding." (*Id.,* § 1.)

Several legal authorities are relevant to assessing whether or not the senior housing project at issue here is a "low rent housing project" within the meaning of article XXXIV of the California Constitution (article XXXIV).

In *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575 [131 Cal.Rptr. 361, 551 P.2d 1193] (*Elliott*), the Supreme Court held that article XXXIV required a local election for a housing program involving "mixed income housing," in which 75 percent of the units were allocated to low-income housing, with the remainder for persons of moderate income. (*Elliott,* at pp. 581–582, italics omitted; see *California Housing Finance Agency v. Patitucci* (1978) 22 Cal.3d 171, 175–176 [148 Cal.Rptr. 875, 583 P.2d 729] (*Patitucci*).) The court found "persuasive" the reasoning that "where a housing project will be a low-income housing project *in effect,* if not by exact definition, article XXXIV, section 1, is applicable." (*Elliott,* at pp. 592–593.) The court concluded that the "substance and primary purpose" of the project at issue was "to provide housing for those who cannot otherwise afford quality housing," and the addition of units for other tenants "does not

---

[14] The regulatory agreement between the Agency and Cuesta Villas also contains a preference system for initial leasing of the units, allocating up to 40 percent to residents of the City who are not current or former employees of the public agencies, up to 30 percent to current or former employees of the public agencies, up to 25 percent to residents of the District who are not residents of the City, and up to 5 percent to the general public.

[15] These terms are defined in the regulatory agreement between the Agency and Cuesta Villas and are based on income limits defined in various provisions of the Health and Safety Code. For example, "moderate income restricted units" are to be occupied by households that earn more than 80 percent but no more than 120 percent of median income.

substantially affect either the basic character of the low-rent housing program or its potential impact on the community." (*Id.* at p. 593.) As the court later said in *Patitucci*, the *Elliott* decision established several principles:

■ —Article XXXIV is "not unambiguous in all of its applications; ample room remains under the constitutional language for honest disagreement as to whether a particular mixed income development constitutes a 'low rent housing project.' " (*Patitucci, supra,* 22 Cal.3d at p. 176.)

■ —A "realistic and functional approach" is to be taken in considering the application of article XXXIV, so that "the potential economic impact on the affected community is the primary test to be applied." (*Patitucci, supra,* 22 Cal.3d at p. 176.)

—The *Elliott* decision was limited to its facts, "and did not preclude a different result in other cases in which other or lesser proportions of housing units were reserved for low income tenants."[16] (*Patitucci, supra,* 22 Cal.3d at p. 176.)

■ —In reaction to the *Elliott* decision, the Legislature adopted the Public Housing Election Implementation Law (§§ 37000–37002), "to clarify ambiguities relating to the scope of the applicability of Article XXXIV which now exist." (§ 37000.) Section 37001 provides that the term "low-rent housing project" as defined in article XXXIV does *not* apply to any development meeting any one of several criteria. As relevant here, the statute clarifies that article XXXIV does not apply if: "(1) The development is privately owned housing, receiving no ad valorem property tax exemption, other than exemptions granted pursuant to subdivision (f) or (g) of Section 214 of the Revenue and Taxation Code, not fully reimbursed to all taxing entities; and (2) not more than 49 percent of the dwellings, apartments, or other living accommodations of the development may be occupied by persons of low income."[17] (§ 37001, subd. (a).)

---

[16] "While we recognized in *Elliott* that a development is not exempt from article XXXIV simply because it includes some moderate income units, this does not mean that all developments which include *any low income* housing must be considered 'low rent housing [projects].' " (*Patitucci, supra,* 22 Cal.3d at p. 177, citing *Elliott, supra,* 17 Cal.3d at p. 593.)

[17] The Legislature found that article XXXIV was approved by the voters to provide "a mechanism for expressing community concern regarding the development, acquisition, or construction of federally subsidized conventional public housing projects," which "typically were different from and inconsistent with housing developments provided by the private sector. Such differences included architecture, design, and locational standards as well as the level of amenities provided. Such developments were occupied entirely by persons of low income, and usually were not subject to ad valorem property taxes." (§ 37000.) Further, "new forms of

—In *Patitucci*, the Supreme Court held that sections 37000 through 37002 represented a constitutionally valid interpretation of article XXXIV, and that a project meeting the statutory criteria, "that is, a privately owned, nontax-exempt housing development, in which no more than 49 percent of the units will be available to low income persons," is not a "low rent housing project" within the meaning of article XXXIV. (*Patitucci, supra,* 22 Cal.3d at pp. 174–175, 179.) In concluding the statute was reasonable and consistent with article XXXIV, the court looked to evidence of the purpose of article XXXIV, observing that its proponents were moved by two primary concerns, "the direct drain on a community's finances and the effect on its aesthetic environment, represented by the tax exempt publicly owned low income housing of that day [1950]." (*Patitucci,* at pp. 177, 178.) And when the Legislature sought to repeal article XXXIV by referendum in 1974, the argument for its retention stated that " '[i]t is important to remember that [article XXXIV] applies only to conventional public housing which is publicly owned and tax exempt.' "[18] (*Patitucci,* at p. 178.) The court concluded that "Unlike the 75–25 percent housing mixture which we examined in *Elliott,* a development meeting the characteristics of section 37001 is not low income 'in effect.' Rather, it is truly 'mixed income' housing, since it represents an obvious good faith effort to integrate low income tenants into a larger community in which the *majority* of people (at least 51 percent) are higher on the economic scale."[19] (*Patitucci,* at p. 178.)

That brings us to this case. The substance of Taxpayers' argument is that Cuesta Villas, the private, not-for-profit corporation that will own (by virtue of its 55-year ground lease) and operate the senior housing project, is a "shell corporation" controlled by the City and Agency and was created by the City to circumvent article XXXIV. Consequently, the argument continues, the project does not meet the "privately owned housing" requirement and hence

---

housing assistance can provide housing for persons of low income in a manner consistent with and supportive of optimum community improvement. Such forms of housing assistance may allow for mixed income occupancy in developments representative of and competitive with similar market rate developments provided by the private sector. Such mixed income developments are frequently comparable to market rate projects in terms of architecture, design, and locational standards as well as the level of amenities provided, and may be subject to ad valorem property taxes." (*Ibid.*)

[18] The argument continued, "It does not apply to other low income housing programs for which the housing remains on the tax rolls and, therefore, contributes its fair share to the financial obligations of the community." (*Patitucci, supra,* 22 Cal.3d at p. 178.)

[19] The court continued: "The statutory requirement that the project be in private ownership in order to immunize it from public referendum provides some assurance that the competitive need to attract moderate income tenants will ameliorate, in part, any aesthetic difficulties previously encountered with traditional publicly owned low income housing. Finally, the requirement that the project be subject to local property taxes fully eliminates the direct loss of local tax revenues which was a motivating factor in the adoption of article XXXIV." (*Patitucci, supra,* 22 Cal.3d at pp. 178–179.)

does not qualify for the section 37001 statutory exemption from article XXXIV. We find no merit in this contention.

First, we note several points relating to Cuesta Villas. It is a duly incorporated domestic corporation of the State of California, organized under the Nonprofit Public Benefit Corporation Law (Corp. Code, § 5110 et seq.) for charitable purposes, and specifically for the primary purposes of developing, owning, maintaining and operating an affordable senior citizen housing development on Norwalk Boulevard. Cuesta Villas was formed by the City on September 12, 2007, and members of the city council were appointed as officers and board members, with the appointments to remain in effect in accordance with the corporation's bylaws. The bylaws identify the initial directors of the corporation, and provide that this initial board "shall prepare the corporation to begin operations by attending to such matters as" electing officers, submitting applications for recognition of tax-exempt status, opening bank accounts if necessary, and so on, and "[t]hereafter, the permanent board shall be elected . . . ." The permanent board members are to be nominated and elected by the members of the city council. The public agencies' validation complaint stated that the transition from the initial board to the permanent board composed of members of the general public would "likely occur shortly after the construction of the Senior Facilities and the initiation of its operations, but may occur sooner."

 Taxpayers assert several complaints about these arrangements. Their principal contention, within which the others are subsumed, is that the City and Agency control Cuesta Villas, and therefore the senior housing project cannot be considered "privately owned." Taxpayers claim the principles enunciated in *Rider v. County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (*Rider I*)—where the Supreme Court held that an intent to circumvent Proposition 13 could be inferred where the plaintiffs proved a newly created tax agency was "essentially controlled" by a city or county that otherwise would have had to comply with a supermajority vote requirement—(*Rider I*, at p. 11, italics omitted)—also apply here. But, as is apparent from the Supreme Court's subsequent decision in *Rider v. City of San Diego* (1998) 18 Cal.4th 1035 [77 Cal.Rptr.2d 189, 959 P.2d 347] (*Rider II*), they do not.

*Rider I* involved the validity of a taxation scheme "enacted for the apparent purpose of avoiding the supermajority voter approval requirement" imposed by Proposition 13 "with respect to any 'special taxes' sought to be imposed by 'cities, counties and special districts' [citation]." (*Rider I, supra*, 1 Cal.4th at p. 5.) The Legislature had created an agency charged with imposing a supplemental sales tax to finance the construction of justice facilities, subject to a simple majority vote. County taxpayers challenged the validity of the tax

approved by a simple majority, and the trial court concluded the tax constituted a deliberate attempt to circumvent the two-thirds voter approval requirement in Proposition 13 for special taxes imposed by special districts. (*Rider I*, at p. 6.) The Supreme Court agreed, concluding the record amply supported the trial court's findings that Proposition 13 had been purposely circumvented and that the agency was created solely for the purpose of avoiding the strictures of Proposition 13.[20] (*Rider I*, at pp. 6, 8.) The court concluded the evidence that the agency "was created to raise funds for county purposes and thereby circumvent Proposition 13" was strong, and further that courts could infer such intent "whenever the plaintiff has proved the new tax agency is *essentially controlled* by one or more cities or counties that otherwise would have had to comply with the supermajority provision of section 4 [of Proposition 13]." (*Rider I*, at p. 11.) Considerations relevant to whether such control exists included the presence or absence of: "(1) substantial municipal control over agency operations, revenues or expenditures, (2) municipal ownership or control over agency property or facilities, (3) coterminous physical boundaries, (4) common or overlapping governing boards, (5) municipal involvement in the creation or formation of the agency, and (6) agency performance of functions customarily or historically performed by municipalities and financed through levies of property taxes." (*Rider I, supra*, 1 Cal.4th at p. 12.)

*Rider II*, however, shows that there is no basis for applying the "essential control" standard in a context having nothing to do with the creation of a taxing agency or with Proposition 13. *Rider II* involved the validity of a financing plan under which a city and a port district created a third public entity (a joint powers agency, referred to as the financing authority) which could issue bonds without complying with voter approval requirements imposed by the California Constitution (with which the city would have had to comply if it had issued the bonds itself). (*Rider II, supra*, 18 Cal.4th at p. 1039.) *Rider II* rejected claims that the joint powers agency was "a mere financing 'shell' that acts at the City's behest, doing for the City what the City may not do in its own name" (*id.* at p. 1041) and that the city was "once again trying to circumvent constitutional constraints" (*id.* at p. 1042). The court observed:

—"The short answer to plaintiffs' argument is that the Constitution and the City's charter permit the City to avoid the two-thirds vote requirement by

---

[20] While acknowledging the general rule "that the possible improper motivations of the Legislature or its members in passing legislation are immaterial to questions involving the validity of such legislation," the court indicated it was "less concerned here with the factual support for the trial court's finding than with the probable intent of the framers" of Proposition 13 (*Rider I, supra*, 1 Cal.4th at pp. 10, 11), which was "to restrict the ability of local governments to impose new taxes to replace property tax revenues lost under" Proposition 13 (*Rider I*, at p. 11).

creating a joint powers agency to finance public works projects. Therefore, however we might characterize the financing plan at issue here, we cannot characterize it as unlawful." (*Rider II, supra,* 18 Cal.4th at p. 1042.) (The court explained that the constitutional provision listed six specific types of governmental entities that may not incur indebtedness without a two-thirds vote, and "joint powers agencies are not on the list.") (*Id.* at p. 1043.)

—The court rejected the argument that the city's control of the joint powers agency rendered the two entities indistinguishable for purposes of the constitutional debt limitation (*Rider II, supra,* 18 Cal.4th at pp. 1043–1044),[21] and expressly stated that the "essential control" standard did not apply: "[W]e have never held that control by itself establishes the identity of two separate governmental entities. Our adoption of the 'essential control' standard in [*Rider I*] was in the context of construing the term 'special districts' in Proposition 13.[22] [Citation.] . . . In [*Rider I*], we expressly rejected the conclusion that the essential control standard established the identity of two separate governmental entities: 'Rather than attempting to demonstrate that the subject agency and county are *identical* entities, application of the "essential control" test simply affords ground for reasonably inferring an intent to circumvent Proposition 13.' [Citation.]" (*Rider II, supra,* 18 Cal.4th at p. 1044.)

—"Because the Financing Authority has a genuine separate existence from the City [citation], it does not matter whether or not the City 'essentially controls' the Financing Authority." (*Rider II, supra,* 18 Cal.4th at p. 1044.)

—"We are not naive about the character of this transaction. If the City had issued bonds to pay for the Convention Center expansion, the two-thirds vote

---

[21] The Supreme Court observed that a similar argument was rejected by the Court of Appeal in *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743 [115 Cal.Rptr. 485], where the plaintiffs argued that a water district was indistinguishable from the county for purposes of the constitutional debt limitation. The district had the same boundaries as the county and performed traditional county functions, and the same individuals sat on the governing boards of both the county and the district. "Nevertheless, the Court of Appeal found insufficient evidence 'that Sonoma County exercises actual control over the actions of the district' [citation], and, therefore, the court held that the district was a separate legal entity from the county. [Citation.]" (*Rider II, supra,* 18 Cal.4th at p. 1043, quoting & citing *Vanoni, supra,* at pp. 750, 749 ["[i]f the facts of *Vanoni* did not establish that the district was indistinguishable from Sonoma County, then the facts in this case certainly do not establish that the Financing Authority is indistinguishable from the City"].)

[22] "We stated that, when a city or county creates and 'essentially control[s]' a local taxing agency, a court can infer that the agency is a 'special district' 'created to . . . circumvent Proposition 13.' [Citation.] But, as noted, the constitutional debt limitation in section 18 includes no broad term analogous to 'special district' that might encompass entities, such as joint powers agencies, that a city or county creates and controls. Therefore, the essential control standard does not apply." (*Rider II, supra,* 18 Cal.4th at p. 1044.)

requirement would have applied. Here, the City and the Port District have created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement. Nevertheless, the law permits what the City and the Port District have done." (*Rider II, supra,* 18 Cal.4th at p. 1055.)

So it is here. The law permits what the City and the Agency have done. Section 37001 expressly provides that when a development is privately owned, receives no ad valorem property tax exemption other than those specified,[23] and does not allocate more than 49 percent of its accommodations to persons of low income, it is not subject to voter approval. Here, the project will be privately owned, as Cuesta Villas is a private, nonprofit corporation duly formed under California law. We are not at liberty to ignore the corporation's status; it has a "genuine separate existence" from the City and Agency, so "it does not matter whether or not the City 'essentially controls' " Cuesta Villas.[24] (*Rider II, supra,* 18 Cal.4th at p. 1044.) Taxpayers have cited no authority that would allow us to conclude otherwise.[25] As in

---

[23] Section 37001 expressly allows two tax exemptions for a privately owned housing project, and Cuesta Villas will seek one of those exemptions. (§ 37001, subd. (a), identifying Rev. & Tax. Code, § 214, subds. (f) & (g).) Subdivision (f) of section 214 of the Revenue and Taxation Code allows an exemption for property "used exclusively for housing and related facilities for elderly or handicapped families and financed by, including, but not limited to, the federal government . . . and owned and operated by religious, hospital, scientific, or charitable funds, foundations, limited liability companies, or corporations meeting all of the requirements of this section . . . ." Subdivision (g)(1) of section 214 of the Revenue & Taxation Code allows an exemption for property "used exclusively for rental housing and related facilities and owned and operated by religious, hospital, scientific, or charitable funds, foundations, limited liability companies, or corporations . . . meeting all of the requirements of this section . . . ."

[24] Taxpayers also complain that there is no risk to Cuesta Villas in the project, because all losses and deficiencies will be cured with additional LMI housing funds. But, as the trial court concluded, while the Agency guarantees Cuesta Villas's ground lease payments, payments under the guaranty are limited to the LMI Housing Fund, which must be spent on affordable housing projects. Taxpayers identify no illegality in these arrangements.

[25] Taxpayers cite *Redevelopment Agency v. Shepard* (1977) 75 Cal.App.3d 453, 461 [142 Cal.Rptr. 212], and *Winkelman v. City of Tiburon* (1973) 32 Cal.App.3d 834 [108 Cal.Rptr. 415] in support of their claim that Cuesta Villas is a shell corporation controlled by the City and Agency, but neither case is relevant. Both cases concluded the projects at issue did not require submission to the electorate. *Shepard,* which stated the redevelopment agency did "much more than merely lend money," but rather shaped and defined the project and did many other things in connection with the project, so stated in concluding that the project in question was " 'developed, constructed, or acquired' " by a public agency under article XXXIV. (*Shepard, supra,* at p. 461.) Here, that point is conceded; the only question here is whether the project is a "low rent housing project." (*Shepard* went on to conclude that the project there was not a "low rent housing project" under art. XXXIV; the project involved residential development in a blighted area but included no income test for occupancy of the newly constructed properties, so that occupancy by persons of low income was "wholly a matter of speculation.") (*Shepard,* at pp. 456, 462.) In *Winkelman,* the project was constructed by a private nonprofit corporation, and the objector's claim was that the agency was so involved that it was a codeveloper.

*Rider II*, the City and Agency have avoided the voter approval requirement of article XXXIV, but the law permits what has been done.[26]

Finally, Taxpayers point out that Cuesta Villas will not own the land on which the senior housing project will be constructed (since it has only a 55-year ground lease). From this fact Taxpayers claim, without citation to the record or to any authority, that if Cuesta Villas should fail to qualify for the tax exemptions specifically permitted by section 37001, "it will have an ad valorem tax exemption through the District's ownership of the land[]" and therefore will not meet the requirement in section 37001 of "receiving no ad valorem property tax exemption . . . ." (§ 37001, subd. (a)(1).) This claim is directly contradicted by the principle pointed out in *Conway v. City of San Mateo* (1981) 127 Cal.App.3d 330 [179 Cal.Rptr. 561] (*Conway*), which held that a proposed project was not subject to article XXXIV voter approval.[27] *Conway* pointed out that it is "well-established that when there is a lease to a private owner of government-owned tax exempt land, the possessory right under the lease *is* subject to taxation." (127 Cal.App.3d at p. 336, italics added.) Taxpayers identify no other basis for claiming the project would have a tax exemption that is not permitted by section 37001.

One final note. The Agency argues that, even if the senior housing project were not expressly excepted from article XXXIV under section 37001, the project would nevertheless not be subject to article XXXIV, because it does not in any event qualify as a "low rent housing project" under the Supreme Court's rationale in *Patitucci*. *Patitucci* pointed out that *Elliott* "left unresolved . . . whether a mixed income project which includes a 'relatively small' percentage of low income units may be deemed a 'low rent housing project' under article XXXIV." (*Patitucci, supra*, 22 Cal.3d at p. 176.) Further, *Patitucci* pointed out that the proponents of the article XXXIV

---

(*Winkelman*, at p. 842.) The court disagreed, and also concluded the project—which the trial court found was "primarily a moderate income project because no more than 30 percent of the units [would] be rented to persons of low income"—was "not primarily a 'low rent housing project.' " (*Id.* at pp. 843–844.)

[26] Taxpayers also cite an opinion of the Attorney General from 1971, in which the Attorney General found no violation of article XXXIV, but stated that: "[W]e do wish to state that conceivably there could be unusual local governmental participation in a 'private development' which could in substance be tantamount to their constructing or to their developing or acquiring the project in question." (54 Ops.Cal.Atty.Gen. 168, 171 (1971).) Again, that point has been conceded; the question is whether the project is a "low rent housing project." Moreover, the opinion predates all the relevant authorities: *Elliott*, section 37001, and *Patitucci*.

[27] The development in *Conway* was not subject to voter approval because it met the criteria in section 37001, subdivision (b). Under subdivision (b), a development is not a "low rent housing project" within the purview of article XXXIV if it "is privately owned housing, is not exempt from ad valorem taxation by reason of any public ownership, and is not financed with direct long-term financing from a public body." (§ 37001, subd. (b).)

initiative were primarily concerned with "the direct drain on a community's finances and the effect on its aesthetic environment" so that the primary test to be applied to a determination of whether article XXXIV applies was the "potential economic impact on the affected community . . . ." (*Patitucci*, at pp. 178, 176.) Those concerns are not applicable to this project, the Agency argues, because only 16 percent of the project's units are reserved for low-income housing (and the project does not give rise to any aesthetic concerns); "there can be no concern regarding the economic drain of the Project on the community" (italics & boldface omitted) because it is being financed with LMI housing funds which the Agency is required to spend on affordable housing projects. Thus, under the *Patitucci* rationale, whether or not the section 37001 exemption applies, the project would not be. a "low rent housing project" within the meaning of article XXXIV. Taxpayers do not respond to this contention. While the Agency's position appears to have considerable force, we need not decide the point in view of our conclusion that the project in any event meets the requirements stated in section 37001, subdivision (a).

> C. *The transaction is not invalidated by reason of the District's lease of the Norwalk Boulevard property without complying with Government Code section 54222.*

 Government Code section 54222 provides procedures to be followed when a local agency disposes of surplus land. Prior to doing so, the local agency "shall send" a written offer to sell or lease the property, for the purpose of developing LMI housing, "to any local public entity, as defined in [section 50079], within whose jurisdiction the surplus land is located."[28] (Gov. Code, § 54222, subd. (a).) Similarly, the local agency must send a written offer to sell or lease "for park and recreational purposes or open-space purposes" to local park or recreation departments or authorities and the State Resources Agency. (*Id.*, subd. (b).) Written offers to sell or lease the property for other purposes not applicable here are also required. (*Id.*, subds. (c)–(e).) The Legislature explained its policy in Government Code section 54220, declaring that housing was a priority of the highest order, that "there is a shortage of sites available for housing for persons and families of low and moderate income and that surplus government land, prior to disposition, should be made available for that purpose." (Gov. Code, § 54220, subd. (a).) The Legislature likewise "reaffirm[ed] its belief that there is an identifiable deficiency in the amount of land available for recreational purposes and that

---

[28] Section 50079 defines a local public entity as "any county, city, city and county, the duly constituted governing body of an Indian reservation or rancheria, redevelopment agency . . . or housing authority . . . , and also includes any state agency, public district or other political subdivision of the state, and any instrumentality thereof, which is authorized to engage in or assist in the development or operation of housing for persons and families of low or moderate income."

surplus land, prior to disposition, should be made available for park and recreation purposes or for open-space purposes." (*Id.*, subd. (b).) ▮ Further (with one inapplicable exception), if an agency disposing of surplus land receives offers for purchase or lease "from more than one of the entities to which notice and an opportunity to purchase or lease shall be given pursuant to this article, the local agency shall give first priority to the entity that agrees to use the site for housing for persons and families of low or moderate income . . . ." (Gov. Code, § 54227.)

Taxpayers argue the District was obliged under Government Code section 54222 to offer the Norwalk Boulevard property (which was designated surplus property) to *other* public agencies (in addition to the Agency) engaged in the development or operation of low- or moderate-income housing, and failed to do so; as a result "the District's Project and the entire Agreement are invalid." The District, which admits it did not follow the dictates of Government Code section 54222, takes the position that sales or leases of surplus school property are generally governed by the Education Code, rather than the Government Code. The Education Code contains provisions governing a school district's sale or lease of real property. (Ed. Code, §§ 17455–17484.) Those provisions expressly require compliance with the Government Code provisions on the sale of surplus property only in specific instances. Thus:

1. Education Code section 17459 provides that a school district's "sale of real property . . . shall be subject to" the Government Code provisions on the disposition of surplus land. (This provision does not apply because the transaction here is not a sale, but rather a 55-year ground lease.)

2. The Education Code also provides that in the case of a sale, or lease with an option to purchase, of real property by a school district, the property must first be offered for park or recreational purposes under sections 54220 to 54232 of the Government Code "in any instance in which that article is applicable." (Ed. Code, § 17464, subd. (a).) (This provision does not apply here because the lease of the Norwalk Boulevard property contains no option to purchase.)

3. The Education Code also governs the sale or lease of surplus school playgrounds, playing fields, and recreational property. (Ed. Code, §§ 17485–17500.) Section 17489 of the Education Code states that "[n]otwithstanding Section 54222 of the Government Code," the governing board must first offer to sell or lease such land to (in order of priority) any city, park or recreation district, regional park authority having jurisdiction, and county within which the land is situated. (Ed. Code, § 17489.)

The District points out that none of the above Education Code provisions is applicable: that is, the Education Code does *not* expressly require compliance with the Government Code provisions on surplus property in the case—as here—of a lease of improved property containing no classrooms or open lands. The District argues that, under the rules of statutory construction, when the Legislature identifies specific categories of transactions that are subject to Government Code section 54222, and omits others, there is a presumption that the omitted categories were not intended to be subject to Government Code section 54222.

 We are inclined to agree with the District. But we need not opine definitively on that point because, even if the District should have offered the Norwalk Boulevard property "for the purpose of developing low- and moderate-income housing" to all the public entities identified in Government Code section 54222, we can discern no conceivable prejudice suffered by Taxpayers or anyone else as a result of its failure to do so. Taxpayers say only that the Norwalk Boulevard property is within a school district that serves several cities besides Cerritos, many of which have redevelopment agencies, and none of them was contacted, so "[i]t cannot be known what would have happened had [Government Code section] 54222[, subdivision] (a) been followed" and "there could have been a whole new chain of events . . . ." But this entirely speculative possibility cannot serve to obscure the fact that the express statutory purpose—requiring surplus property to be sold or leased for purposes of developing LMI housing—has been fully met. Indeed, the statute specifically requires the local agency to give "first priority" to the entity that agrees to use the site for low- or moderate-income housing. (Gov. Code, § 54227.) Government Code section 54222 itself states that, with respect to any offer to purchase or lease, "priority shall be given to development of the land to provide affordable housing for lower income elderly or disabled persons or households, and other lower income households." (Gov. Code, § 54222, subd. (a).) Moreover, we note that, under section 54230.5 of the Government Code, "[t]he failure by a local agency to comply with this article"—which includes Government Code section 54222—"shall not invalidate the transfer or conveyance of real property to a purchaser or encumbrancer for value." While this provision may not on its face apply to this transaction, because the City and the Agency are leasing, not purchasing the property, it clearly demonstrates the Legislature's intention not to elevate form over substance. Consequently, we have no hesitation in concluding that the District's failure to comply with Government Code section 54222— assuming it applies—does not operate to invalidate the transaction.[29]

---

[29] Taxpayers also argue that *either* the District must comply with Government Code section 54222 *or* the City and Agency cannot benefit from section 37001 to avoid article XXXIV. (See pt. B., *ante.*) Their theory is that if the District's conveyance of the Norwalk Boulevard property is a lease (which it is) rather than a sale (and thus not subject to Gov. Code, § 54222),

D. *There is no merit to Taxpayers' claim that the Agency failed to comply with section 33433.*

Under the CRL, "before any property of the agency acquired . . . with tax increment moneys is sold or leased for development pursuant to the redevelopment plan, the sale or lease shall first be approved by the legislative body by resolution after public hearing." (§ 33433, subd. (a)(1).) Before the hearing, the agency must prepare a report, available to the public, containing a copy of the proposed sale or lease and a summary describing a number of items, including an "explanation of why the sale or lease of the property will assist in the elimination of blight, with reference to all supporting facts and materials relied upon in making this explanation."[30] (§ 33433, subd. (a)(2)(B)(iv).) The resolution approving the lease or sale must contain a finding "that the sale or lease of the property will assist in the elimination of blight *or* provide housing for low- or moderate-income persons . . . ." (§ 33433, subd. (b), italics added.)

Taxpayers claim that the resolutions of the City and Agency expressly found that "the proposed improvements enable the provision of affordable housing in the community as a means to fulfill the obligation to eliminate blight," and as a consequence, the report prepared by the Agency should have contained "supporting facts and materials relied upon" to explain *why* the lease of the Norwalk Boulevard property would "assist in the elimination of blight . . . ." (§ 33433, subd. (a)(2)(B)(iv).) Because there is nothing in the report that refers to any evidence that the project will assist in the elimination of blight, Taxpayers claim the City and Agency did not comply with section 33433 and "cannot be permitted to proceed."

---

then the Agency cannot claim the section 37001 exemption from article XXXIV, which applies only to "privately owned" housing. Taxpayers characterize this as a "dilemma" and say that only one of those positions can be correct. Taxpayers are wrong. As we have seen, a long-term lease constitutes an ownership interest in property. (See *Conway, supra*, 127 Cal.App.3d at pp. 332, 336 [in a case where the city leased property to a private entity for 55 years, § 37001 exception requiring private ownership applied and voter approval under art. XXXIV was not required; it was "undisputed that the proposed project will be privately owned"].)

[30] The summary must also describe: "(i) The cost of the agreement to the agency, including land acquisition costs, clearance costs, relocation costs, the costs of any improvements to be provided by the agency, plus the expected interest on any loans or bonds to finance the agreements. [¶] (ii) The estimated value of the interest to be conveyed or leased, determined at the highest and best uses permitted under the plan. [¶] (iii) The estimated value of the interest to be conveyed or leased, determined at the use and with the conditions, covenants, and development costs required by the sale or lease. The purchase price or present value of the lease payments which the lessor will be required to make during the term of the lease. If the sale price or total rental amount is less than the fair market value of the interest to be conveyed or leased, determined at the highest and best use consistent with the redevelopment plan, then the agency shall provide as part of the summary an explanation of the reasons for the difference." (§ 33433, subd. (a)(2)(B)(i)–(iii).)

Taxpayers' argument has no merit. The statute requires a finding by the legislative body that the transaction *either* will assist in the elimination of blight *or* will provide housing for LMI persons. (§ 33433, subd. (b).) The resolutions expressly state the Agency's intention to lease the Norwalk Boulevard property to Cuesta Villas "in order to meet its obligations under Redevelopment Law to provide for affordable housing in the City . . . ." That is one of the two alternatives specified by the statute. The added finding that the provision of affordable housing is "a means to fulfill the obligation to eliminate blight" is, at worst, superfluous; certainly it cannot operate to require the Agency to demonstrate that the senior housing project will eliminate blight when there is no statutory requirement that the project do so.

Taxpayers also contend that the report does not comply "with the remaining requirements" of section 33433, complaining—without elaboration—that there is no statement of clearance costs; no statement of relocation costs; and no discussion of whether or not the transaction is at or below fair market value.[31] Taxpayers also complain that the report contains no "estimated value of the interest to be conveyed or leased, determined at the highest and best uses permitted under the plan" (and no highest and best use financial data) with respect to the Moore/166th Street properties. (See § 33433, subd. (a)(2)(B)(ii).)

We see no defect in the report that would render the expenditure of tax increment funds for the Norwalk Boulevard property invalid. Pages 3 to 10 of the report contain detailed information on the cost of the agreement to the Agency (including relocation costs), and the estimated value of the interest to be conveyed to Cuesta Villas. Taxpayers specify no reason why the information provided should be considered deficient. Certainly the information is in substantial compliance with statutory requirements. (See *Contra Costa Theatre, Inc. v. Redevelopment Agency* (1982) 131 Cal.App.3d 860, 865, 866 [184 Cal.Rptr. 630] (*Contra Costa*) [summary comported with the requirements of § 33433 "by providing ample information for those interested in assessing the fairness and the tax cost of the transaction"; disclosures "substantially complie[d] with the relevant statutory requirements"].)

As to Taxpayers' claim that there is no "estimated value of the interest to be conveyed" or financial data on the highest and best use of the Moore/166th Street properties that the City will lease to the District, the Agency's report states that this portion of the project "does not require review

---

[31] An explanation of the reasons for a difference between the sale price or total rental amount and fair market value is to be provided "[i]f" the sale price or total rental amount is less than the fair market value of the interest to be conveyed. (§ 33433, subd. (a)(2)(B)(iii).)

under § 33433" because the Moore/166th Street properties will be owned by the City (as opposed to the Agency). (Section 33433 applies when "property of the agency acquired . . . with tax increment moneys is sold or leased for development pursuant to the redevelopment plan . . . ." (§ 33433, subd. (a)(1).)) Taxpayers counter that the property is being purchased with LMI housing funds. But in any event, the Agency's report states that even if section 33433 applies, the estimates that appear elsewhere in the report (in connection with the requirements of § 33445, governing payment for land and improvements) would cover the point. The report shows the amount of tax monies to be used for the Moore/166th Street properties. It contains information on the total estimated cost of land acquisition and improvements on the Moore/166th Street properties (which were purchased from private owners), and shows that the revenue generated in the form of lease payments from (or purchase by) the District will be transferred to Cuesta Villas for operation of the senior housing project. In short, a perusal of the report shows it contains "ample information for those interested in assessing the fairness and the tax cost of the transaction." (*Contra Costa, supra*, 131 Cal.App.3d at p. 865.)

> E. *The common law doctrine of "incompatibility of office" does not apply.*

Finally, Taxpayers contend that, because the members of the city council (who sit as the board of the Agency) also sit on the initial board of directors of Cuesta Villas, the common law doctrine of "incompatibility of office" is violated. There is no merit in this contention.

The doctrine of incompatibility of office applies when the same person holds two public offices. For example, in *People ex rel. Chapman v. Rapsey* (1940) 16 Cal.2d 636 [107 P.2d 388], the court found the offices of city judge and city attorney incompatible, and held that when the respondent accepted the office of city attorney, his acceptance "had the effect of vacating or terminating his right to hold the office of city judge." (*Id.* at p. 644.) The rule is " 'that where an individual is an incumbent of a public office and, during such incumbency, is appointed or elected to another public office and enters upon the duties of the latter, the first office becomes at once vacant if the two are incompatible [citations] . . . .' " (*Ibid.*) Here, Cuesta Villas is a nonprofit corporation, and its board members do not hold public offices. (See *id.* at p. 640 [" ' "it is essential that the incumbent [of a public office] be clothed with a part of the sovereignty of the state to be exercised in the interest of the public" ' "].) Consequently, there is no basis of any kind for application of the doctrine of incompatibility of office.

## DISPOSITION

The judgment is affirmed. The respondents are to recover their costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.